# ANCIENT COIN COLLECTORS GUILD, et al.,

## v.

# UNITED STATES DEPARTMENT OF STATE

# Civil No. 07-2074 (RJL)

# Exhibit H



United States Department of State

*Washington, D.C.   20520*

MAR 2 2 2004

Case Control No. 200100359

Peter K. Tompa
Counsel for the International Association of
  Professional Numismatists
McDermott, Will & Emery
600 Thirteenth Street, N. W.
Washington, D. C. 20005-3096

Dear Mr. Tompa:

A Department of State Appeals Review Panel, whose members
are listed in an enclosure to this letter, has considered
your appeal of October 17, 2001, for the release of one
document withheld in part by the Department in responding to
your request under the Freedom of Information Act.

It has decided to release the document in its entirety.   The
released material is enclosed.

Sincerely,

FRANCIS TERRY MCNAMARA
CO-CHAIRMAN, APPEALS REVIEW PANEL

Enclosure:
  One document.

ρ

b 5

# REPORT

## of the

## CULTURAL PROPERTY ADVISORY COMMITTEE ·

## on the

## REQUEST FROM THE
## GOVERNMENT OF THE REPUBLIC OF ITALY
## RECOMMENDING U.S. IMPORT RESTRICTIONS ON CERTAIN
## CATEGORIES OF ARCHAEOLOGICAL MATERIAL

DEPT OF STATE APPEALS REVIEW PANEL (ARP)

| FOIPA/PA | Mandatory Review |
|---|---|
| ( ✓ ) Release | ( ) Declassify |
| ( ) Excise | ( ) Declassify in Part |
| ( ) Deny | ( ) Class. Ret/Renew |

Exemptions _____
ARP Action Cert _____ Date _____

February 7, 2000

REPORT
ITALY REQUEST, 1999

# PREAMBLE

On September 16, 1999, the Government of the United States received a request from the Government of the Republic of Italy to restrict the importation into the United States of certain archaeological materials from Italy.  The request was transmitted from the Ministry of Foreign Affairs of the Republic of Italy to the U.S. Information Agency (USIA) through the Embassy of the United States in Rome, Italy.  The United States and Italy are State Parties to the 1970 UNESCO Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property.  This request represents an effort by the Republic of Italy, within the framework of the 1970 UNESCO Convention, to protect its cultural patrimony that it considers to be in jeopardy from pillage.  The request provides considerable documentation in support of its request for restrictions on the importation of certain Italian archaeological artifacts into the United States.

The Associate Director of USIA's Bureau of Educational and Cultural Affairs referred Italy's request to the Cultural Property Advisory Committee for its review and investigation as required under the Convention on Cultural Property Implementation Act (Public Law 97-446, Title III, as amended). The responsibility for considering the committee's recommendations and determining whether the U.S. should apply import restrictions rests with the Department of State. The committee conducted an investigation into whether there is jeopardy to Italy's cultural patrimony due to the pillage of archaeological materials.

At meetings on October 12-13, 1999 and November 21-22, 1999, and through materials circulated to the committee after November 22, the committee reviewed the information provided by Italy in its request and supplemental material gathered by the staff or submitted by interested parties.  The committee made positive finding regarding the four required determinations and recommended that the Government of the United States and the Government of the Republic of Italy enter into a bilateral agreement to impose import restrictions on certain categories of Italian archaeological materials dating from the 8th c. B.C. through the 4th c. A.D. The committee also expressed its view that the import restriction should not be imposed unless Italy in turn was prepared to take certain reciprocal steps recommended in this report toward the end that these joint actions would lead to a partnership to enrich Italian cultural patrimony and American cultural life.

b S

1

REPORT
ITALY REQUEST, 1999

# BASIS FOR THE REQUEST AND REPORT

The request submitted by the Government of the Republic of Italy to the Government of the United States invokes the 1970 UNESCO Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property. The Convention went into effect for the United States on December 2, 1983, for Italy on January 2, 1979. Under the Convention, State Parties agree to take measures to protect archaeological and ethnological materials that comprise their cultural patrimony and to assist other State Parties whose cultural patrimony is in jeopardy from the pillage of those materials. Italy's request falls under the authority of Article 9 of the UNESCO Convention, which states:

> *Any State Party to this Convention whose cultural patrimony is in jeopardy from*
> *pillage of archaeological or ethnological materials may call upon other State*
> *Parties who are affected. The State Parties to this Convention undertake, in*
> *these circumstances, to participate in a concerted international effort to*
> *determine and to carry out the necessary concrete measures, including the*
> *control of exports and imports and international commerce in the specific material*
> *concerned. Pending agreement each State concerned shall take provisional*
> *measures to the extent feasible to prevent irremediable injury to the cultural*
> *heritage of the requesting State.*[1]

The Convention on Cultural Property Implementation Act, as amended,[2] authorizes the President to consider requests from any other State Party for U.S. import restrictions on archaeological and ethnological materials. According to the Act, a request must be accompanied by a written statement of the facts known to the State Party relating to the determinations which must be made by the President before action is taken.[3]

Italy's request is concerned with a range of materials of archaeological interest. The Act defines materials of archaeological interest as being 1) of cultural significance; 2) at least 250 years old; and 3) normally discovered as a result of scientific excavation, clandestine or accidental digging, or exploration on land or under water.[4]

Under Section 303 of the Act the President may enter into an agreement with another State Party to apply import restrictions to archaeological or ethnological material the pillage of which jeopardizes the cultural patrimony of the requesting State Party. Before entering into such agreements, certain determinations must be made, as summarized below:

---

1  Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property. United Nations Educational, Scientific and Cultural Organization, General Conference, 16th Session, November 14, 1970, Paris; Article 9 (hereafter "Convention").

2  P.L.97-446, Title III (19 U.S.C. 2601-2613), hereafter "Act".

3  Act, Section 303(a)(3).

4  Ibid., Section 302(2).

1) that the cultural patrimony of the State Party is in jeopardy from the pillage of its archaeological or ethnological materials;

2) that the State Party has taken measures consistent with the Convention to protect its cultural patrimony;

3) that the application of U.S. import restrictions would be of substantial benefit in deterring a serious situation of pillage and that less drastic remedies are not available; and

4) that the application of import restrictions is consistent with the general interest of the international community in the interchange of cultural property among nations for scientific, cultural and educational purposes.[5]

Before executing an emergency action, under Section 304 of the Act, the President must determine that an emergency condition applies with respect to any archaeological or ethnological material of the State Party. The President may then apply the import restrictions set forth in Section 307 with respect to such material.[6]

---

5 Ibid., Section 303(a)(1).

6 Ibid., Section 304.

3

## COMMITTEE'S REVIEW OF REQUEST AND INVESTIGATION

*I.*     *History and Character of Archaeological Heritage in Italy*

The Request claims, with some justification, that Italy is the country with the greatest density of archaeological property per square kilometer. The high degree of archaeological density is the result of millennia of prehistoric and historic occupation of the Italian Peninsula.  The importance of the Italian archaeological sequence is in part due to Italy's geographical position. Bounded on the north by the Alps, the Italian peninsula lies between the Balkan-Hellenic peninsula to the east and the Franco-Iberian peninsula to the west.  It forms a pivotal link between the Mediterranean world and continental Europe.  Home to the Etruscan culture, the wealthy Greek colonies of Magna Graecia, and center of the Roman Empire with all the political, economic, social, artistic, and cultural innovation that one of the world's greatest empires entailed, Italian archaeological heritage is one of the richest on earth. From the Neolithic period to the Early Christian Era, Italy's archaeological strata illustrate an uninterrupted cultural development. In art, architecture, philosophy, and politics, this heritage profoundly influenced modern western culture from the Renaissance to the present.

Neolithic and Eneolithic (6th to 3rd millennium B.C.)[7]

Between 6000 B.C. and 2800 B.C., the traditional hunting and gathering economy of the Paleolithic was replaced by the introduction of agriculture, stock rearing, weaving and pottery. Using pottery production, it has been possible to reconstruct accurately the various phases of this complex period. Initially it was characterized by Impressed Ware and then by painted forms of pottery. Among the noted Neolithic cultures are those of Lagozza (Varese), Fiorano, Chiozza and Pescale (Emilia), with their square-mouthed and scratched decorated pots. Neolithic traces have been identified in the hut villages of the lower Brescian area, in Emilia and the Teramo area (Valle della Vibrata) or in the rock dwellings and tombs of Pulo di Molfetta (Puglia), Stentinello, Megara Hyblaea and Matrensa (Sicily).

The second half of the third millennium B.C. is characterized by the gradual introduction of metallurgy from the Eastern Mediterranean. The Eneolithic (Copper Age) produced interesting pottery types from Rinaldone (Viterbo), Gaudo (Paestum) and Remedello (Brescia).  Pastoral settlements with rock-cut tombs or trench graves characterize this period.  The Camunian culture its traces in the rock engravings of the lower Val Camonica (Brescia) and began the development that was to continue throughout the Bronze Age. The pastoral way of life is represented by the Apennine culture that developed in Central-Southern Italy.

---

7 Request, pp. 9-12.

## Bronze Age (2nd to 1st millennium B.C.)[8]

Between the end of the 3rd millennium and the beginning of the 1st millennium B.C., the Italian Bronze Age is characterized by the introduction of metal alloys for weapons and tools and increasing trade with Europe and the Mediterranean. New tools, including metal plows and axes, allowed for more efficient farming and greater exploitation of wood resources. However, development of farming communities was not uniform. Italian culture during the Bronze Age was highly regional and differentiated by local styles of architecture, pottery, metal working, and subsistence. By the end of the period, burials indicate an accumulation of wealth and differentiation in power in monumental tomb architecture and rich tomb offerings. The latter often included necklaces, pins, weapons, amber, glass, and bone ornaments.

Important contacts between Italy and Greece began at the beginning of Late Bronze Age. The earliest Greeks (Mycenaeans) set themselves up on islands of Lipari and Vivara. Contacts were particularly strong in the Aeolian Islands, Sicily and Southern Italy. Mycenaean Greek colonies have even been proposed at Taranto. Local copies of Mycenaean wheelmade decorated pottery were certainly produced, and the model of the Aegean palatial system may also have had some effect on local Italian culture.

A close relationship between Sardinia and Cyprus existed at the end of the Bronze Age, apparently related to mining and metallurgy. Iron Age Phoenician/Cypriot interest in the western Mediterranean was probably aroused by these contacts, which may have been continuous since the Late Bronze Age. Early Iron Age contacts clearly existed between Sardinia and Etruria, and it may have been this pre-existing trade network which encouraged visitors from the Eastern Mediterranean and ignited the colonization movement.

## Iron Age (9th c. to 6th c. B.C.)[9]

Regional differentiation at the end of the Bronze Age continues into the Iron Age. Many of the groups historically important in Pre-Roman Italy (Villanovan, Etruscan, Latial, etc.) were established in Northern Italy. Greek colonies flourished in Southern Italy and Sicily.

In the 9th and 8th c. B.C., the Villanovans lived in small villages, in round or rectangular huts, practiced cremation, and buried their ashes in urnfields. A distinctive Etruscan culture evolved about the 8th c. B.C., developed rapidly during the 7th c. B.C., achieved its peak of power and wealth during the 6th century, and declined during the 5th and 4th centuries. Etruria had no centralized government, but rather comprised a loose confederation of city-states. Important centers include Clusium (modern Chiusi), Tarquinii (modern Tarquinia), Caere (modern Cerveteri), Veii (modern Veio), Volterra, Vetulonia, Perusia (modern Perugia), and Volsinii (modern Orvieto).

Already in the 9th c. B.C., Etruscans began to supply grave goods with their burials. At first these showed no great differentiation in terms of wealth, age, and gender. The bronzes (especially the fibulae, ancient safety pins or brooches) show central European influence but also contacts with other parts of Italy, especially Sicily, Campania, and Calabria. In the first half of the 8th c. B.C., Etruscans began to reach out to other trading partners. They began to import Greek pottery of the late Geometric and then proto-Corinthian types in great quantity. Popularity of Greek pottery was such that Greek potters installed themselves in Etruscan communities and set up local workshops.

---

8 Request, pp. 12-14.
9 Request, pp. 14-18.

Toward the end of the 8th c. B.C., increasing wealth and differentiation within the Etruscan cities is evident in the variety of weapons, horse bits, bronze vessels, personal ornaments in gold, silver, bronze, and glass often produced by Phoenician or other Eastern Mediterranean artists. The "symposium set," used in a dining ritual and composed of wine mixing bowl, jugs, and cups, is often found in Etruscan tombs of the period and attests to the cultural as well as artistic influence of the Greeks. Many of the items found in tombs are sought after by tombaroli (professional tomb robbers) for sale on the international market.

At the same time Etruscan culture was developing in Tuscany, the Latial culture continued to develop in the area around modern Rome. As in Etruria, the importation of Greek Geometric pottery was followed by the artisans themselves. And, as in Etruria, the second half of the 8th c. B.C. saw increasing economic differentiation. This was primarily expressed in a wealth of tomb offerings including weapons, horse trappings, wagons, tools, symposium furniture, ornaments in precious metals and stones, and many imports from the eastern Mediterranean. These tombs too are subject to looting.

Greeks set up their first trading center on mainland Italy at Pithekoussa in Ischia in the first half of the 8th c. B.C. By the middle of the century, the first true colonial city was established at Cuma. By the end of the century Greek settlers from Chalcidea, Eretria, Corinth, Megara, Sparta, Locris, Rhodes, and Crete had established new cities at Naxos, Syracuse, Megara-Hyblaea, Leontini, Katane Rhegion, Zankle/Messene, Posidonia, Mylai, Metapontum, Taranto, and elsewhere. In the 7th c. they continued with the settlement of Gela, Akrai Kasmenai, Imera, Selinunte, Locris, and others. Called Magna Graecia as an expression of the importance of the Italian colonies to the Greek homeland, the colonial cities of Sicily and Southern Italy were indisputably Greek in thought, language, urban design, architecture, sculpture, religion and philosophy. Local Italic ethnic groups did not resist this development but were progressively integrated into the Magna Graecian identity. However, they also made contributions to Greek cities developing on the Italian peninsula in the areas of town-planning, legislation, music, and theater.

The end of the 8th c. B.C. saw a flowering of culture throughout Italy called the "Orientalizing Phase." Etruria, Latium, and Magna Graecia already developed urban civilization led by a princely ruling class. This literate and wealthy aristocracy possessed land, easy access to trade, and knowledge of disciplines of history, geometry, architecture, astronomy, physics, music, and science. They loved exhibiting their wealth, culture, and international connections.

During the Orientalizing Phase, princes constructed large tumuli for their burials and as expressions of status. They filled these monumental chamber tombs with objects of daily use: granary jars, wine amphorae, honey containers; and prestige: weapons, thrones, scepters, incense burners, elaborate jewelry, combs, breastplates, belts, perfume containers, fine ceramics, musical instruments, and even inscriptions. The prestige objects were made of expensive materials by Eastern Mediterranean or Greek craftsmen working on Italian soil. Rare shells, amber, and gemstones were imported into Italy for use by these craftsmen. Imported pottery included that of the Aegean islands, Corinth, and Sparta.

Sardinian culture followed a slightly different trajectory. Phoenician colonists developed urban ports at Karalis, Nora, Bithia Sulcis, Tharros, Bosa, and Olbia. But they seem to have excluded the local populations from the profitable international trade. Local Nuragic culture was confined to small villages and relative poverty after a flowering of their culture in the previous centuries.

Archaic Period (7th to 6th c. B.C.)[10]

The development of Archaic culture in Magna Graecia mirrors that of Archaic Greece. Colonization in Southern Italy and Sicily developed without great conflict with local inhabitants who were increasingly absorbed into the colonial cities. However, conflict between the Greek colonies was a constant fact of life. In Central Italy, the Archaic period saw great development in Etruscan city-states which incorporated Rome by the late 7th c. B.C.

The cities of Magna Graecia and Etruria show rapid architectural and economic development during this period. Impressive walls, sewer systems, cemeteries, sanctuaries, and temples were built of stone or wood. Based on Greek designs, and highly decorated with architectural terracottas and sculptural groups, the temples reflect the wealth of the cities that produced them. Burials continue to express the high rank and lavish lifestyle of their occupants. Some of the only known Greek monumental paintings can be found in these tombs. Sculpture and relief in sandstone, limestone, or marble were used as temple votives or funerary monuments. A wide variety of metalwork, from tools and weapons to elaborate jewelry and statuary, were used in daily life, as temple offerings, and in tombs. Life-size statuary was not yet imported from Greece, but local Etruscan sculptors produced large-scale pieces in the local style. The cities of Magna Graecia began to mint coins at the end of the 6th c. B.C. Each city produced coins with designs that reflected the origins and aspirations of the city.

The written word became more important in public and private life during this period. Artifacts and monuments with votive, dedicatory, or memorial inscriptions are found in sanctuaries, votive deposits or public urban places.

Pottery of Archaic and Classical Italy assumes great importance both as indestructible stratigraphical evidence and the local Italian desire for all things Greek. With regard to the latter, so great is the amount of Attic pottery found in Italy that until the early 1800's, archaeologists thought that it had been made by the Etruscans. High-quality Attic black figure and red figure pottery was made in Greece in vast quantities specifically to satisfy the demand of the Italian markets in Etruria and Magna Graecia. The Request references an analysis by Rizzo in Bollettino d'Arte (Supplement 89/90, pp. 25-50) that illustrates that more than 50% of the known provenience of named Attic masters originates in Italy. For some masters, Euphronios for example, the percentage is much higher. Attic, Corinthian, Laconian, and other Greek pottery is found primarily in tombs of Etruria and Magna Graecia, although it may also occur in temples. It is highly valued on the current art market and sought after by tomb robbers in both areas.[11]

Italy in the Archaic Period was itself a production center for high-quality decorated ceramics. These include Ionic, Chalcidean, and Italiot products from Magna Graecia; the Etrusco-Corinthian, Pontic, Caeretan, Etruscan black figure all imitate Greek proto-types or, in some cases, were produced by Greek artisans in Italy. Glossy red impasto and shiny black bucchero pottery, often decorated with stamped or relief decoration, are indigenous products, widely circulated as luxury goods. Deposited in temples and tombs, these are less costly than Attic pottery on the current art market, but highly desirable and also sought after by tomb robbers.

---

10 Request, pp. 18-21.
11 Request, p. 36.

## Classical Period (5th to 4th c. B.C.)[12]

The last years of the 6th c. B.C. saw vast political movements in the Mediterranean Basin. New laws consolidated the power of aristocrats in Athens. A treaty between Carthage (Phoenicians) and Rome, while limiting the autonomy of the city-state of Rome, guaranteed the independence of the Etruscan city-states. At the end of the 5th c. B.C., Persian incursions ended the independence of the Greek cities of Asia Minor and even resulted in the destruction of much of Athens. After Athens repulsed the Persian invasion, a flurry of rebuilding and construction of new public monuments resulted in the creation of the "severe" and successive classical forms in architecture and sculpture known thereafter as the "Golden Age" of classical art. The Greek sculptural and architectural innovations of this era had a tremendous impact both on the Greek city-states in Southern Italy and on the developing tastes of Etruscans and Romans.

Drawn into political conflicts with the Phoenicians and Etruscans, the Greek city-states of Southern Italy and Sicily eventually prevailed with the victory at Cuma in 474 B.C. Artisans in cities such as Morgantina, Taranto, and Megara-Hyblaea produced elaborate objects in bronze, silver, and gold (plates, mirrors, weapons, armor), marble, stone, and terracotta for the wealthy classes or votives for the numerous sanctuaries, temples and burials. Coins were refined in design and production. Most of these circulated within internal markets or were kept in hoards to hedge against financial or political disaster. Inscribed bronze plaques were placed in sanctuaries.

### Italic Peoples from the Archaic Period to the Augustan Age

Greek, Roman, and Etruscan city-states dominated the Italian political and cultural scene throughout the Archaic and Classical periods, other groups such as the Piceno, Sabellic, Samnite, and Daunian people developed autonomously prior to their ultimate incorporation in the Roman Republic and Empire. The territorial distribution of these peoples is noted in the histories of Strabo, Pliny, Polybius, and Livy. Archaeological evidence is more difficult to assess. The Piceno, for example, occupied the territory between the Apennines and the Adriatic coast. From the 7th c. B.C., their tombs testify to a warlike aristocracy and contacts with Etruscan and Greek merchants. Through the 4th c. B.C. the local population exhibited a great demand for high-quality Attic vases as well as fine Etruscan wares. On the Adriatic coast in the northern part of modern day Apulia, the Daunians developed a culture open to contact with the Dalmatian coast and the nearby colonies of Magna Graecia. The most important of these was Taranto, a wealthy city with elaborate public and private architecture decorated with sculpture in terracotta and stone. The local Daunian pottery, in production since the 8th c. B.C., shows strong traces of this contact and is inspired by Greek colonial imports. Canosa, a Daunian site, maintained supremacy in production for export. Decorated polychrome pottery maintained its popularity both locally and for export through the 3rd c. B.C. when production centers at Ruvo and Gnathia created pottery with motifs styled after late classic pottery of Athens.

### Republican Rome (4th to 1st c. B.C.)[13]

After the institution of the Republic, Rome took on a political, legislative, and military structure which eventually allowed it to conquer all of Italy. Its position in the

---

12 Request, pp. 21-24.
13 Request, pp. 24-26.

peninsula was established at the beginning of the 4th c. B.C. with the conquest of Veii, the southernmost city of Etruria. Expansion into Southern Italy followed with ultimate conquest of Taranto in 272 B.C. and Syracuse in 212 B.C. The defeat of Carthage marked Rome's dominance over Italy and the Central Mediterranean. Successful wars against Macedonia, Syria, and Corinth completed the opening of the Eastern Mediterranean to Roman dominance. As a result of political domination, masterworks of Greek art including statuary, silver, painting, and stone relief reached Rome as the trophies of war. Artists and architects from the defeated Greek and Eastern cities arrived in Rome also and contributed to the modification of local Roman figurative and architectural tradition.

Building activity in Rome increased with its expansion in Italy and abroad. New temples and sanctuaries were placed in the public spaces of the city and decorated with large scale terracotta and bronze sculpture. Greek artists and artisans contributed to this production. Local and Greek craftsman also produced large numbers of smaller scale votive heads and statues for dedication within the sanctuaries. Public spaces like the Roman Forum were used for public exhibition of statues to commemorate people and events related to the political fortunes of the city. Monumental narrative paintings recorded episodes which represent the values of the Roman Republic. Local workshops produced luxury goods for the Roman aristocracy.

The Late Republic is characterized by a crisis in the traditional city-state government following the conquest of the Mediterranean world. The changes brought about by a concentration of riches and political power saw the emergence of private interests, rivalry among Roman generals, and the emergence of new economic classes. The rapid diffusion of Hellenistic culture was a direct result of the military conquests and at the higher levels of Roman society this diffusion caused a profound transformation in their traditional values and how they were expressed through the medium of art.

Through a singular process of culturalization, the Roman ruling class wholly adopted Greek culture as it appeared in the Hellenistic cities and royal courts of the 2nd c. B.C. During this period, the Greek cities so admired by the Romans were looking to their own golden age of Athenian supremacy for models to emulate. Roman imperial art as a whole followed this Greek lead and itself turned to classical Athenian models in art and architecture. Even the new narrative and figurative themes related to real Roman events and ideals were adapted to Greek models. Aristocratic Romans decorated their new villas using Greek artisans and Greek styles. Copies and originals of classical Athenian Greek statuary decorated the villa gardens, wall painting, silver table ware and furniture decorated with inlay, ornaments of all sorts decorated the interior rooms, all to demonstrate the owner's knowledge and appreciation of things Greek. The material and style of these items also makes them very desirable on the current art market and attracts looters to the sites of ancient villas and sanctuaries around modern Rome.

Portraiture in the last century of the Republic was of extremely high quality. Powerful individuals in the Italic cities dedicated honorary statues in great numbers, but also simple citizens and freeman attempting to climb the social ladder used portraiture for their funerary monuments. Funerary monuments also provided a vehicle for social advancement. Many non-aristocratic citizens imitated the expensive and varied architectural forms associated with the tombs of the upper class. The decoration of these tombs illustrated the accomplishments, titles, public honors or trade of their owners.

In the public sphere, political representation and propaganda assume a predominant role. The local nobles set out to embellish the cities of Central Italy and Campania with works for public use and appreciation. Spectacular monumental

sanctuary buildings they hoped to emphasize the importance and aspirations of their
city.

## Imperial Rome (1st to 4th c. A.D.)[14]

The events of the late 1st c. B.C. are marked by a move from republican to
dictatorial regimes. With the advent of the principate of Augustus (27 B.C. - 14 A.D.),
Rome became an empire. The Roman Empire was to formally last until beyond the mid
5th c. A.D., but came to an end for all practical purposes at the death of Theodosius in
A.D. 395. A new classicism manifested itself during the first part of the Empire, not just
in adaptation of Greek models, but in the decided appropriation of Greek ideals for the
use of the image. Copies of well-known Greek originals reached extraordinary numbers
and assumed both an ideological and political value. The flow of artists from the Greek
world to Rome became systematic.

In the first half of the 1st c. A.D., the monumentalization of imperial buildings
intensified. Arches, theaters, amphitheaters, baths were grand in scale and
magnificently decorated. The first real imperial palaces appeared with Nero and the
Flavians. In and outside Rome, portraits of great Romans and private individuals were
copied from the official Imperial portrait which graced public places throughout the
Empire. For women, portraits of Imperial ladies were also prototypes to be copied.
Funerary monuments were standardized and simplified, but it is still possible to identify a
specific class of funerary monument as specifically Italian in origin (freedman reliefs,
Padano-Venetan cylindrical funerary altars, and others.) Many of these funerary objects
were made of local Italian stone and made to circulate only on the peninsula.

By the 3rd c. A.D., the growing state of uncertainty and unease in the Imperial
political and social structure was reflected in architecture and art. For the first time in
centuries it was thought necessary to construct new walls at Rome. At the division of
the Empire in A.D. 330 when Constantine's Edict moved the capital east to
Constantinople, the formal characteristics of Roman art were already set and did not
change immediately. The Roman art of the 4th c. A.D. is essentially a regal art
characterized by extreme luxury, vast dimensions, great volumes of space and material.
Only in the 5th c. A.D. did the materials, design and craftsmanship decline with the
declining fortunes of the western Roman provinces.

## II.    Italian Heritage at Risk

As documented in the Request,[15] Italy's archaeological sites and movable cultural
heritage have been subject to pillage for hundreds of years. As the Roman empire
collapsed, barbarians entering Rome sacked it and carried off many antiquities. Vandals
are recorded as having removed an enormous quantity of bronzes via ship to North
Africa. The sack of Rome in 1527 also resulted in many losses. By 1800, the only
Italian state that had not been pillaged was Naples where the ruling family refused to
allow antiquities to leave their territory. Other areas of Italy, notably Etruria, suffered
from the sale of antiquities by Napoleon's brother. Thousands of vases from Vulci were
sold during this period. Loses through looting of cemeteries, temples, and villas
continued through the Second World War.

After the Second World War, new agricultural techniques and equipment opened
the door to further destruction. Deep plowing has been particularly destructive in

---

14 Request, pp. 27-28.
15 Request, pp. 30-37.

uncovering buried cemeteries and sites that were subsequently looted. The post-war economic boom also led to a booming market in antiquities purchased to restore European museum collections and to develop new private collections.

Thousands of burials, temples, sanctuaries, villas, and public buildings in archaeological sites have been looted during the 1960's-1980's to supply the trade with Italian artifacts of all classes, but particularly with Attic black figure, red figure and Apulian vases. As noted in the Request, looting "irreparably shatters the connections and associations in each context that permit an attempt at reconstructing and understanding (through patient work of documentation and analysis), a site which is buried with all its historical connotations."[16] The President of the Archaeological Institute of America, the Executive Director of the United States Committee of the International Council of Museums and Sites, and a number of archaeologists and scholars submitted letters concurring with the latter observation.

Staff research and interviews as well as written and oral submissions by dealers, archaeologists, a collector/museum trustee, curator, and coin collectors provided further information to the committee on current jeopardy to Italian patrimony.[17] This information is summarized in the paragraphs below.

The Carabinieri Nucleo Tutela del Patrimonio Artistico (TPA, National Police for the Protection of Patrimony) and Guardia di Finanza (GDF, National Revenue Police compile statistics regarding arrests and recoveries. A letter from Nancy Wilkie, President of the Archaeological Institute of America (AIA), provided information on Italian enforcement of their patrimony laws. Statistics from the Italian Art Police (Carabinieri Nucleo Tutela del Patrimonio Artistico) show that more than 120,000 archaeological objects were recovered from clandestine excavations in the period 1993-1997, with all but one of Italy's 20 regions reporting recoveries.[18] The organized nature of the looting is evident in two major police operations in the last two years. In Sicily, arrests were made in an illegal operation involving another 10,000 antiquities worth an estimated $35-60 million. In March of this year, a third looting and smuggling operation was broken involving some 11,000 antiquities.[19]

Reports in the Italian national and regional press provide more detailed information on specific instances of looting and illegal possession of antiquities in 1999. Among the published accounts compiled by staff are the recovery of illicitly obtained artifacts from looters near a Naval Station in Sicily; seizure of 400 artifacts in an illicit collection near Acerra; recovery of Roman coins near Crucoli; seizure of 500 artifacts looted from burials in Sardinia and intended for sale on the Internet; discovery of over 100 looted tombs near Orvieto; arrest of four people for trafficking in illicit antiquities from underwater sites near the Gulf of Baratti; the recovery of 150 artifacts from clandestine excavations in the area of San Severo; seizure of 1550 artifacts and manuscripts from clandestine excavations and underwater sites near Marsala; seizure of Etruscan and Roman archaeological artifacts and arrest of four men for looting in the area of Rome; and discovery of 400 recently looted tombs in a necropolis near Montanaro di Francolise.[20]

---

16 Request, pp. 34.
17 Appendix B, List of Individual Submissions to the Committee.
18  Letter of October 8, 1999, submitted to Committee for presentation by Ricardo Elia at the open session, p. 2.
19 "Feature - Italy Art Crime Booms in Borderless Europe" (Reuters, May 13, 1999), Italy Briefing Book, 1999, Tab F.
20 Italy Briefing Book, 1999,  "Examples of Italian News Reports", Tab D.

An archaeologist who works in Italy provided both a written and oral statement to the committee describing instances of looting in the last year gathered from the various archaeological superintendencies in Italy.[21] He noted that there are over 500 major recorded sites and countless minor ones that fall under the responsibility of the Italian state including Tarquinia and Cerveteri; Tivoli and Rome; Pompeii and Herculaneum, Paestum, Syracuse, Agrigento, and Segesta. These sites, he pointed out, are major cities whose full extent cannot be encompassed within an archaeological park, sometimes because of the hilly terrain and often because of the limits of private property. These peripheral areas are under constant assault by clandestine diggers. They include major sites as well as hundreds more lesser ones. In his presentation he enumerated the instances of looting in the past year reported by the archaeological authorities in the following regions: Etruria, Campania, Pompeii and Herculaneum, Apulia, Calabria and Basilicata, Sicily. The most highly sought after antiquities, he reported, include terracotta figurines, small bronze sculptures, bronze vessels, and jewelry. Fragmentary wall paintings and marble sculptures from villas are also prized. The largest market and the one that in his estimation drives the most extensive and destructive looting is for Greek pottery and coins.

A museum curator present at the October 12, 1999 meeting noted that there has been an abundance of high-quality unprovenienced archaeological material of Italian origin recently on the market in New York, London, Frankfurt, Basel, Zurich and Geneva; much of it from southern Italy.

Some of the dealers present at the open session spoke to the committee about looting. They indicated that to their knowledge there are no current incidences of looting. One remarked that the art market for classical antiquities is depressed right now and thus there is no reason for looting.

## III.    Italian Legislation and Institutions for the Protection of Cultural Heritage

After the unification of Italy, the first legislative initiative for the protection of cultural heritage was introduced in 1872 and issued on June 12, 1902. That law lacked export control and it was amended on June 20, 1909. This law, a great improvement over the earlier one, introduced some fundamental principles that continue to be the basis for the current legislation. A precise discipline was dictated for archaeological research, and export was prohibited when it would seriously damage history. On June 1, 1939, Law No. 1089 was issued dealing with the protection of artistic and historical patrimony. This law replaced and improved upon the law of 1909 and is still in force.[22]

Law No. 1089 subjects cultural property to export control. It stipulates that no object of significance can be exported if its export endangers the national heritage. However, it does allow export for temporary exhibition and export for sale if the export of the object is not judged to be of significance to the national cultural heritage. The law further declares that objects owned by the State (all objects discovered during archaeological excavation or by chance) are inalienable. In the case of chance discovery, the law also provides for compensation based on the value of the recovered objects. The compensation cannot exceed a quarter of the value of the object itself. Objects in private collections come under State control after the objects have been

---

21 Malcolm Bell, III, Professor, University of Virginia, written statement of oral presentation, October 12, 1999, "Statement on the Italian Proposal for a Bilateral Accord on Cultural Properties."
22 Request, pp. 38-50. Italy Briefing Book, "Law of 1 June 1939", Tab F.

assessed and found to have such historical or artistic value that they warrant public protection. At that point the owner (possessor or holder of the object) is subject to a series of obligations and limitations including the requirement to obtain authorization in advance to undertake removal, destruction, or restoration of the object. Limitations also include a prohibition against export. Transgression of the law is met with sanctions including fines and imprisonment. These sanctions were made more severe in a recent modification to Law No. 1089 (Law 88, March 30, 1998). Provinces, towns, and other public institutions and organizations that hold cultural property must be able to provide the authorities with a descriptive list of their holdings.

Article 10 of Law 44, March 1, 1975 requires dealers in objects of archaeological or historical/artistic interest to register with the Ministry of Cultural Heritage and Activities. Dealers are obliged to keep a register of all transactions including a description of the articles acquired or sold, notes on provenience of the articles, and information on purchasers. A copy of the register must be given to the local superintendency every six months. The registers serve to facilitate administrative control allowing the artwork to be traced as it changes ownership.

The Ministry of Culture has presented a new bill in Parliament part of which deals with investigation of works of art and antiquities used in money laundering operations. Valuable objects are often deposited at credit institutions as collateral. The bill plans to extend the credit institutions' obligation to report such deposits and to facilitate the activities of the judicial police to use false purchases to gather proof. The bill proposes to introduce penalties for dealers who do not keep registers of purchase and sale of objects. Reductions in sanctions against guilty parties who collaborate in recovery of stolen or exported cultural property have also been proposed. To encourage reporting of chance finds, a form of indemnity has been proposed in the new bill. In its latest version, the superintendency must decide if the one who reports the possession of archaeological objects can become the proprietor of the object or the temporary holder for the State.

## The Ministry for Cultural Heritage and Activities

Protection, management and appraisal of cultural property is entrusted to this ministry with the Legislative Decree of October 20, 1988, n. 368. The Ministry for Cultural Heritage and Activities includes a number of offices and institutes relevant to the management of cultural heritage. The Central Office for Archaeological, Architectural, Artistic and Historical Property coordinates the activities of the regional Archaeological Superintendencies and the Central Cataloging and Documentation Institute, Central Restoration Institute, and the Technical Service for Security. Through its ability to administer concessions for archaeological excavation (a prerogative reserved for the State), the Ministry issues permits for excavation to Italian and foreign universities and cultural institutions.

The regional Archaeological Superintendencies are staffed by archaeologists, art historians, and architects who design, direct, and execute archaeological excavation and restoration projects and assess private collections. Some Superintendencies monitor the circulation of archaeological artifacts and works of art. In this capacity they review applications for export licenses. Superintendencies also are responsible for the oversight of regional museums and archaeological areas, including providing guards for 24-hour surveillance and cooperation with the local police.

The Central Cataloging and Documentation Institute develops programs of general cataloging of cultural property. It also promotes and co-ordinates the cataloging undertaken by the Superintendencies, creates and manages the general property

catalog, and manages publication. In addition, it has the duty of providing scientific data regarding cultural property when it is necessary to provide scientific evidence for the repatriation of cultural property.

The Central Restoration Institute, founded in 1939, coordinates research, experimentation, and methodological coordination in conservation and restoration. Field projects in restoration and conservation are authorized by the superintendencies and undertaken by them or by the owner of the item or site. The Ministry of Cultural Heritage and Activities invests about 70% of its budget in restoration projects, but the funds are still insufficient. The European Union provides some funding for projects in economically depressed areas of Italy. To raise the remaining necessary funds, a new lottery was established in 1997 whose proceeds are entirely devoted to cultural heritage projects. It is expected that this lottery will generate 900 billion lire between 1998 and 2000.

## Carabinieri Command for the Protection of Artistic Heritage (Carabinieri Nucleo Tutela Patrimonio Artistico)

Founded in 1969, the Carabinieri Command for the Protection of Artistic Heritage (TPA) was the first police force in the world to specialize in cultural property. Working within the Ministry for Cultural Heritage, it has the principal task of coordinating national and international prevention, investigation and prosecution of theft and fencing of art works; damage and destruction of archaeological sites and unlawful taking of artifacts; illegal export; forgery; and illegal possession and commerce in works of art. It also undertakes investigations of organized criminal activity in this area including money laundering. With a force of 100 officers, the TPA works in all regions of Italy in cooperation with other national police forces like the Guardia di Finanza (Revenue Police) and local police.

## Interministerial Commission for the Recovery of Art Works

The Interministerial Commission for the Recovery of Art Works was founded in 1995 to resume the work carried out between 1945 and 1983 by the Restitution Delegation. This commission is charged with negotiating the return of Italian works of art found in Germany as the result of World War II. A new interministerial decree in 1997 broadened the Commission's mandate to include activities of a diplomatic-cultural nature aimed at the recovery of works of art taken from the Italian artistic patrimony for any reason and without time limit. The Commission intervenes in those cases when diplomatic negotiation is preferred to judicial or police action more commonly undertaken by the TPA.

## International Agreements and Conventions

Italy has signed and ratified the following agreements concerning cultural property:
- 1954 Convention for the Protection of Cultural Property In the Event of Armed Conflict
- 1970 UNESCO Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property
- 1972 UNESCO Convention Concerning the Protection of the World Cultural and Natural Heritage

• UNIDROIT Convention on Stolen and Illegally Exported Cultural Property

Italy also has bilateral policy agreements in support of exchange of exhibits and cultural initiatives, and archaeological excavations with 62 countries including the following market countries: France, Japan, Great Britain, and Switzerland.

Regional Agreements and Conventions[23]

By virtue of its membership in the European Union, Italy participates in a number of European Union (EU) treaties, regulations, and decisions which regulate the movement of cultural property within the EU and from the EU to other non-EU states. Within the EU, the *Convention drawn up on the basis of Article K.3 of the Treaty on European Union* requires mutual recognition of customs regulations between members of the European Union. This stipulates that when an item is exported from Italy to another member state of the European Union, the customs officer in the importing state must recognize Italian export regulations. The same convention also requires cooperation across borders within the European Union to prevent illicit traffic in cultural goods (Article IV Title 19.1).

Under the EU *Council Regulation (EEC) No. 3911/92* when cultural goods are exported from the customs area of the European Union, a license is required. Any member state of the European Union may issue an export license; however, that license may be refused if the goods are covered by national legislation protecting archaeological and other treasures (Title 1 Article 2.2). *Commission Regulation (EEC) No. 752/93* requires that documentation of the legal status of the goods be presented before the license is given. The actual implementation of the foregoing regulations and seriousness of purpose is expressed in the *Commission Decision of July 16, 1998* making training of officials dealing with export controls on cultural goods a priority.

The European Union also has a regulation mandating the return of cultural goods unlawfully removed from the territory of a member state (*Council Directive 93/7/EEC of 15 March 1993*).

Presentations at the open session and letters indicate that antiquities dealers and coin collectors believe that both the Italian patrimony laws and implementation of protection for sites, museums, and monuments are seriously flawed. Many of the letters and presentations characterize the Italian laws as punitive and the restrictions on the import and export of art as cumbersome and unworkable. Many also suggest that ownership of antiquities has been criminalized and that the law creates an incentive to export antiquities and hide old collections. Dealers and collectors believe that facilitating trade in antiquities in Italy and instituting some form of a treasure trove law (as in England) would solve the problem of looting and illicit trade.

## IV.    *The Market for Antiquities*

The Request indicates that the U.S. and Great Britain are the primary locations for the international art market in Italian antiquities. Sotheby's and Christies auction houses as well as many antiquities dealers are active in London and New York. Sotheby's stopped holding any antiquities sales in London in 1997 and since then has concentrated its antiquities sales in New York. Statistics drawn from the *Kunstpreis*

---

23 Request, pp. 49-50, Briefing Book, "Summary of Concerted Action Re: Italy," Tab I.

*Jahrbuch* (Art Price Yearly) between 1993 and 1997 suggest that the most significant items are sold at auction in the U.S. and Great Britain.[24]

Staff research using trade journals and the internet produced a list of 35 dealers, primarily in New York, in classical antiquities and coins.[25] Sotheby's and Christies auction houses hold classical antiquities sales twice yearly. In recent years, the two auction houses have sold close to 300 lots of specifically Italian artifacts per year with a combined value of over $3 million.[26] The Italian Request also includes Attic pottery as it is commonly found in Etruscan and South Italian tombs and temples. Sotheby's and Christies auction between 40 and 70 vases per year for a combined value of $500,000 to $1,500,000.[27] The analysis of the spring 1999 antiquities sales in New York and London published in *Minerva* reports on many pieces of Italian origin and closes with the observation that there is continued strength in the antiquities market.[28]

Museums and private collectors purchase Italian antiquities for their collections, as do dealers for resale. The nature of the market and the source of those antiquities are subject to debate. Several recent newspaper articles analyze links between museum and private acquisitions and looted artifacts in the 1980's.[29]

The Source of Antiquities Circulating on the Open Market

The source of antiquities for sale in the U.S. and the strength of the market is contested. Dealers believe that materials currently on the market come primarily from old European collections and that the market is currently weak in the area of classical antiquities. Archaeologists, on the other hand, believe that many of the artifacts on the market in current years come from recently looted sites, not old collections. Ricardo Elia presented the results of his research in this area at the open session.[30] According to him, the archaeological, art historical, market, and enforcement data indicate that systematic, intensive, and organized looting of sites in Puglia has dramatically increased since the 1970s and is continuing today. He found that more than 4,000 previously unrecorded Apulian vases have appeared on the market and in collections during the 1980s and 1990s, most of these without record of find location or ownership history (provenience). Sotheby's representative disputed the meaning of the lack of published provenience saying that the catalog is a marketing tool and that if the history of ownership is not relevant to the marketing of an object, or if the owner requests anonymity, then it is not included in the catalog.

Staff continued to research the question of market and sources after the open session on October 12, 1999. A recent dissertation entitled *Greek Vases in New*

24 Request, p. 76.
25 Briefing Book, "Galleries and Dealers in Classical Art and Antiquities," Tab G.
26 Briefing Book, "New York Auction Sales of Roman Artifacts Referenced in the Request (1995-1999)," Tab I. Note that only those items that were clearly marked in their titles as Roman or other specifically Italian cultural group were included in the statistics.
27 Briefing Book, "New York Auction Sales of Attic Pottery Types Referenced in the Request (1995-1999)," Tab I.
28 Briefing Book , Jerome M. Eisenberg, "The Spring 1999 antiquities sales," *Minerva*, Vol. 10 No. 3 (1999), Tab G.
29 Briefing Book, Walter V. Robinson, "Italy calls N.Y. museum's prized collection stolen," *Boston Globe*, April 17, 1998; Walter V. Robinson, "New MFA link seen to looted artifacts," *Boston Globe*, December 27, 1998; Walter V. Robinson, "Museum defends artifacts collection," *Boston Globe*, December 29, 1998, Tab G; Alexander Stille, "Head found on Fifth Avenue," *The New Yorker*, May 24, 1999, Tab F.
30 Ricardo Elia, Vice-President, Archaeological Institute of America, oral and written remarks, October 12, 1998.

*Contexts: Collecting Greek Vases – An Aspect of Modern Reception of Antiquity* systematically investigates some of the issues raised above.[31] Norskov analyzes all painted Greek vases (including Apulian) offered for sale between 1953 and 1993 in 534 catalogs from auction houses and antiquities dealers in Europe and the United States. She analyzed a total of 16,356 vases, identifying three sources for the vases; 1) old collections, primarily private collections, occasionally museum collections; 2) "fresh" material, i.e., recently excavated, often illegally exported; and, 3) forgeries (a problem that could not be addressed.) Norskov defines all vases with any reference to earlier owners, publications of any sort, or to a possible find spot, as provenienced. All vessels without note of previous ownership are defined as "unprovenienced."

Norskov summarizes her results as follows: "A survey of the vases offered on the market between 1953 and 1993 shows a distinct rise in the quantity of vases until the end of the 1980s and a decrease during the first part of the 1990s. This decrease was accompanied by a larger number of vases that had been offered for sale earlier in the post-war period. The average of vases with a documented provenience as around 20 per cent of the supply of the entire period but in 1993 the provenienced vases constituted 40 per cent of the supply."[32] Elsewhere in the dissertation, she observes that highest percentage of re-sales also occurred in 1993 when about 10% of the vases already were offered in more than one sale. The latter she interprets as an indication of a new trend towards buying ancient art for investment purposes rather than buying to build a collection.[33] Norskov's results tend to confirm other research on the source of Apulian (and other painted pottery) in the last twenty years and the dealers' observations on the recent weakness in the market.

Her dissertation provides some insight into the size and number of old private collections as the source of materials coming on the market and the role of published provenience in obtaining the best price for an object.  She records the auction sales of 57 private collections with more than 10 vases between 1953 and 1993.[34] The average number of vases per collection is 32, but the median is 20.  (The average is inflated due to one collection of 284 vases.)  The total number of vases sold from private collections 1953-1993 was 3000 out of 16,356 vases total, or about 20% of all vases sold at auction.  While it is entirely likely that some of the 13,000 "unprovenienced" vessels in the auction catalogs belong to undocumented private collections, the sheer number of unprovenienced items make it unlikely that they would comprise the majority of "unprovenienced" vessels at any given sale.  If the size of collections from unrecorded private collectors is, on average, the same as that of recorded private collections, then one would expect over 600 private collectors to have contributed anonymously to these sales.

Identifying a trend developing in the 1990's, Norskov lists auctioned vases in rank order by price.  This list indicates that the vases for which the highest prices were paid virtually all had documentation of former ownership.[35] This development, she believes, demonstrates a wish to avoid the negative publicity and cost of demands for restitution by countries of origin that might accompany the purchase of an undocumented piece.  In any case, the value of published provenience is clearly expressed in the higher prices of

---

31 Vinnie Norskov, *Greek Vases in New Contexts: Collecting Greek Vases – An Aspect of Modern Reception of Antiquity,* PhD Dissertation, University of Aarhus, Aarhus, Denmark, November 1998, Briefing Book, "English Summary." Tab I.
32 Ibid., English Summary, p. 8.
33 Ibid., p. 149.
34 Ibid., p. 160.
35 Ibid., p. 196.

provenienced vs. unprovenienced pieces. Again, this makes it unlikely that unless faced with a compelling reason for anonymity, a private collector would choose to present his vases as unprovenienced. Thus Norskov's analysis tends to support the conclusion that the majority of the unprovenienced items in auction catalogs are new materials from recently looted sites.

A museum curator also commented on the validity of the "old private collections" argument for the source of new material on the market. She indicated that in reality there are very few collections of licitly removed material that have not been studied or published--or offered for sale to her museum and others. She further noted that classical scholars are assiduous in tracking down any rumor of an unpublished object and most collectors have long recognized that publication enhances the value of their works of art. Only those seeking to avoid the attention of foreign governments, taxation or insurance premiums are likely to keep their collections secret.

Commenting specifically on the inclusion of coins in the list of restricted objects, written comments and letters from coin dealers and collectors strongly suggest that the find spots, production of many thousands of multiples, and wide distribution of coins makes them inappropriate for trade restrictions. They also indicate that the coins most sought after by collectors are coins in pristine condition found in savings and emergency hoards outside archaeological strata. Noting that coins in archaeological contexts have suffered much from the elements, they suggest that these have little value for the collector. Coin collectors and coin dealers also pointed out that broad circulation patterns covering many countries and regions in both ancient and modern times precludes a claim by an individual country that a specific coin belongs to them. Dealers and collectors further suggested that the implementation of import restrictions on coins would be entirely unworkable.

On the other hand, archaeologists note that coin collectors with metal detectors are a serious threat to the integrity of Italian sites. They dig holes, destroy archaeological contexts, and remove metals illicitly for their own collections or for sale. In a phone interview another field archaeologist working on an Etruscan village site observed that coin collectors with metal detectors visit her site most weekends and damage the surface areas with indiscriminate digging.

## The Role of Collectors and Museums in the Trade of Antiquities

Collectors and curators providing information to the committee also commented on their role in the acquisition of undocumented antiquities. Collectors pointed out that collectors and museums are the preservers of culture: they purchase items that would otherwise be destroyed for their material value (as in gold) or when they could not be sold after having been found by chance. Responsible collectors, it was further noted, research the history of an object before purchase, conserve it, publish it, and share it with the public and scholars. One collector made the suggestion that if governments would sell some of their surplus objects on the open market, then more money would be available for conservation and display. A curator noted that the sale of surplus duplicates from museums would be unlikely to stem looting because the illicit trade is fueled by the growing interest in unique objects of great monetary value, not seconds and minor artifacts that would constitute duplicates.

Some collectors and curators believed that a ban on the importation of such objects would make it difficult for museums to carry out their mission of educating the broad public. In the U.S. museums want to display the objects that the public would like to see and that, in some collectors and curators estimation, requires permanent collections that can only be formed through acquisitions. Another curator felt that

REPORT
ITALY REQUEST, 1999

museums would not be impoverished by not being able to acquire undocumented materials. Increased attention to conservation, documentation, and exhibition of existing collections, development of exchanges and loans with local and international museums, increased publication and dissemination of information, are very productive and do not require new acquisitions.

## V.    Multinational Response or "Concerted Action"

Two contrasting analyses of the status of multinational response were put forward to the committee by interested parties.[36] One set of letters reviewed the ratification of the 1970 UNESCO Convention and UNIDROIT among European market countries and found nothing to indicate the existence of current "similar" import restrictions nor any indication that they would be implemented in the near future.[37] These letters state explicitly that neither the United Kingdom nor France have imposed import restrictions on imports of Italian antiquities.

Another set of letters reviewed the pending ratification of the 1970 UNESCO Convention and UNIDROIT by European and Asian market countries, the implementation of European Union cultural directives, and the activities of Commonwealth countries with regard to cultural property and found that these did demonstrate a multinational response to the problem of looting in Italy.[38] The letters indicate that Canada and France have ratified the UNESCO Convention, Switzerland is proceeding formally toward ratification during the next year, and the United Kingdom and Japan are examining the UNESCO Convention and considering ratifying it. The letters further examine the status of the European Union regulatory regime (outlined above on p.15), noting that these regional agreements require export licenses from the country of origin and the return of illegally exported cultural objects to their country of origin. States

---

36 Convention on Cultural Property Implementation Act, Section 303 C:
(c) RESTRICTIONS ON ENTERING INTO AGREEMENTS.-

> (1) IN GENERAL.-The President may not enter into a bilateral or multilateral agreement authorized by subsection (a) unless the application of the import restrictions set forth in section 307 with respect to archaeological or ethnological material of the State Party making a request to the United States under article 9 of the Convention will be applied in concert with similar restrictions implemented, or to be implemented, by those nations (whether or not State Parties) individually having a significant import trade in such material.
> (2) EXCEPTION TO RESTRICTIONS.-Notwithstanding paragraph (1), the President may enter into an agreement if he determines that a nation individually having a significant import trade in such material is not implementing, or is not likely to implement, similar restrictions, but-
>> (A) such restrictions are not essential to deter a serious situation of pillage, and
>> (B) the application of the import restrictions set forth in section 307 in concert with similar restrictions implemented, or to be implemented, by other nations (whether or not State Parties) individually having a significant import trade in such material would be of substantial benefit in deterring a serious situation of pillage.

37 David Grace, Covington and Burling, Letters of November 1, November 19, 1999 and December 2, 1999. Pierre F. Valentin, Director of Public Affairs, Sotheby's Europe, Letter of November 19, 1999.
38 Patty Gerstenblith, Professor, DePaul University School of Law, Letters of October 11, 1999 and November 15, 1999.

subject to these regulations include Austria, Belgium, Denmark, Finland, France, Germany, Greece, Ireland, Italy, Luxembourg, The Netherlands, Portugal, Spain, Sweden, and the United Kingdom. The letters also note that two of the market countries for Italian antiquities, United Kingdom and Germany, are included within the European Union regulatory regime.

In an attempt to clarify some of the inconsistencies in the two analyses of multinational response, staff prepared an analysis of European Union Conventions and Regulations and a chart showing ratification and/or signature of 1970 UNESCO Convention, UNIDROIT, and European Union regulations. The chart is reproduced below.[39]

| Market Country | 1970 UNESCO Convention | UNIDROIT | European Union Import Restrictions |
|---|---|---|---|
| United Kingdom | 1999 - Ratification under consideration | 1999 -Ratification under consideration | Yes |
| France | 1997 - Ratified | Signed 1999 - Ratification under consideration | Yes |
| Switzerland | 1998 - Ratification and implementation recommended | Signed | No |
| Germany | | | Yes |
| Japan | 1999 - Ratification under consideration | | No |

Staff also contacted the appropriate authorities in France to determine how the European Union regulations and the UNESCO Convention were being implemented. Nicolas Renard of the Office Central de lutte contre le trafic des biens culturels indicated that under the 1970 UNESCO Convention and the European Union regulations, France recognizes the export controls of any country who is a state party to the Convention or a member of the European Union. French customs officials would demand an export certificate prior to allowing any archaeological object to be imported into France. On being asked specifically whether export certificates are required to import Italian antiquities into France, he indicated that they are required.

## VI.    Opportunities for Research and Exchange[40]

The government of Italy provides opportunities for research and exchange through a wide variety of mechanisms. The Ministry for Cultural Heritage and Activities maintains an active publication program. From 1990 to 1996, the ministry published 291 books dealing with archaeological subjects, including 136 museum catalogs.

Access to archaeological research opportunities in Italy is provided through the Ministry's regulation of excavation permits. Since the 18th c. foreign archaeologists have been allowed to excavate in Italy and the current regulations continue to allow scientific excavation by qualified individuals and organizations. In 1997, for example,

39 "Summary of Concerted Action Re: Italy," Briefing Book, Tab I.
40 Request, pp. 79-80.

there were 33 foreign archaeological campaigns in Italy, six of them from the United States. A number of the U.S. archaeological excavations in Italy are sponsored by the American Academy in Rome School of Classical Studies. Since its founding in 1895, the School of Classical Studies has promoted all phases of classical scholarship. Programs for undergraduate students, graduate students, and research scholars occur throughout the year at the School. Excavations include Cosa; Horace's Villa, Licenza; Janiculum Mills; and Statonia (Bomarzo). The German Institute, the French School, and the British School in Rome also support excavation and research facilities for students and scholars.

Many scholars come from all over the world to visit and study Italian archaeological sites and materials. To facilitate their work, the law of July 23, 1980, No. 502 provides them with free access to museums, monuments and archaeological sites belonging to the State. Since 1997, free entrance to all museums and monuments is provided for all members of ICOM (International Council on Museums) on presentation of their membership card.

Italy also makes its archaeological heritage available for exhibitions abroad. From 1993 to 1997, archaeological materials were lent to 87 exhibitions abroad, organized by foreign institutions. For example,

- in the late 1980's the Michael C. Carlos Museum at Emory University in Atlanta, working with colleagues at the Regional Archaeological Museum in Syracuse (Sicily), organized an international loan exhibition of ancient Sicilian art deriving from archaeological proveniences;
- a later exhibition brought ancient Roman sculpture to Emory from places such as the Museo Nazionale in Rome;
- in 1996 the Kelsey Museum at the University of Michigan initiated a collaboration with the Museo Nazionale Romano which resulted in a loan exhibition that was shown both in Ann Arbor and in Rome; and
- a 1998-1999 exhibition of Etruscan antiquities was held at the Fitchburg Art Museum, in Fitchburg, Massachusetts; this exhibition was a collaboration between the museum and the Italian archaeological superintendency in Tuscany; the Italian Cultural Institute in New York; the Piaggio Foundation; the Community of Volterra; and the Museo Guarnacci, Volterra.[41]

Indeed, to further favor the circulation of cultural patrimony, law 532/97 has extended the lending time from six months to one year. The same law has introduced a state indemnity instead of insurance for exhibitions organized abroad by the Ministry of Cultural Heritage and Activities or by other Italian cultural institutions.

Italian institutions also actively collaborate with cultural institutions in other states in support of archaeological research and conservation. Among the most recent European projects are the collaboration of the Florence Archaeological Museum with the Museum of Minz on triumphal carriages and tomb furnishings; the University of Messina, Museum of Agrigento, Museum of Athens and Museum of Cyprus project on ancient Mediterranean coins; the Superintendency of Naples, British School of Rome, University of Leeds, and Spanish School of Archaeology project at Pompeii; and the recent creation of a European network for the protection and conservation of archaeological archives.

---

41 Nancy Wilkie, President of the Archaeological Institute of America, Letter of October 8, 1999.

# FINDINGS RELATED TO AN AGREEMENT

*Determination 1) that the cultural patrimony of the State Party is in
jeopardy from the pillage of its archaeological materials.*

In discussion, the majority of the committee found that pillage does jeopardize
the Italian cultural patrimony. One committee member expressed the sentiments of the
majority when she noted that Italy has had a real problem. She observed that "the
articles about pillage provided in the briefing book had some real facts behind them.
The number of vases coming out of Apulia has skyrocketed and looting in Etruria seems
to be escalating also." In discussion it was also noted that based on information and
evidence provided in the Request and by staff and members of the public, professional
tomb robbers rather than farmers carry out the looting and that organized crime seems
to be behind some of these activities. Another committee member remarked that the
archaeologists' "documentation [of looting] was quite definitive."

Two members of the committee did not find that pillage jeopardizes Italian
cultural patrimony, at least not as broadly as it is characterized in the request. A
dissenting committee member stated that "pillage implies something very substantial. It
does not imply casual things." He suggested that other countries seeking import
restrictions have demonstrated severe, on-going looting. For Italy, he believes severe
looting exists in the south of Italy, not in other parts of the country. His vote against the
finding was based specifically on the procedure of making general findings for the entire
country rather than proceeding with findings on a regional or site-by-site basis.

> **Finding 1** - *Based upon the information provided in the request from the
> Government of the Republic of Italy and supplemental information
> gathered during its investigation and review of the request, the committee
> finds that the cultural patrimony of the State Party is in jeopardy from the
> pillage of Italian archaeological materials.*

Seven members voted for this finding; two voted against.

*Determination 2) that the State Party has taken measures consistent with
the Convention to protect its cultural patrimony.*

The majority of the committee made a positive finding with respect to this
determination. Discussion centered on whether Italy had taken reasonable measures to
protect its cultural patrimony and what constituted reasonable measures. Committee
members noted that protective legislation and a police unit entirely devoted to the
protection of cultural patrimony were in place. Committee members also observed that
there is a problem of theft within Italian museums and a problem with smuggling, a
problem exacerbated, according to one dissenting committee member, by Italy's own
"retentionist" policies. The committee noted a problem in the protection of Italian
archaeological sites. However, it was also the sense of the majority of the committee
that this request offered the opportunity for the committee to make certain types of
recommendations that would reduce the frequency of looting and thus help further the

protection of Italian cultural patrimony. One of the dissenting committee members believed that the Italians were not taking reasonable measures throughout the country. His vote against this finding was based on the procedure of making general findings for the entire country rather than proceeding with findings on a regional or site-by-site basis.

> **Finding 2** - *Based on the information provided in the request from the Government of the Republic of Italy and supplemental information gathered during its investigation and review of the request, the State Party has taken measures consistent with the Convention to protect Italian archaeological materials.*

Seven members voted for this finding; two voted against.

**Determination 3) that the application of U.S. import restrictions would be of substantial benefit in deterring a serious situation of pillage and that less drastic remedies are not available.**

The majority of the committee members believed that import restrictions would be of benefit and that concerted action is present within the existing and pending legislation in other market countries. One member observed that the committee received "information that indicates that there are certain types of materials whose import restriction would be beneficial in stopping pillage" in Italy.

Another committee member noted that the concerted action of other market nations was outlined in detail in a letter from Patty Gerstenblith, a specialist in cultural property law and Professor of Law at De Paul Law School, and in the staff summary. The 1970 UNESCO Convention has been ratified by France, and Switzerland and Japan and the UK are considering ratifying it. UNIDROIT has been signed by France and Switzerland, and France is considering ratifying it. European Union conventions concerning the import of cultural goods (No. 3911/92) and return of cultural goods (93/7/EEC) apply to UK, France, and Germany.[42]  The committee member further observed that while the legislative situation is "fluid," all of the countries are working in the same direction, i.e., toward the regulation of the movement of cultural objects.

The committee reviewed the letters from David Grace, legal counsel for Sotheby's and Christies, outlining an argument for the lack of concerted action with regard to the Italian request. After discussion, the majority of the committee rejected his argument as too narrow and decided that the European Union regulations, France's implementation of the 1970 UNESCO Convention, and the active movement of other market nations (UK, Switzerland, Japan) towards ratification of the 1970 UNESCO Convention or UNIDROIT constituted concerted action.  One of the two dissenting committee members believed that the requirement for concerted action was not met because only France, Canada, and Finland have signed and ratified the 1970 UNESCO Convention, and thus market countries like the UK and Germany are not participating in concerted action.  The other dissenting member stated that while the European Union regulations technically meet the requirement for concerted action, how and whether these regulations are, in fact, implemented is unknown.

The committee reviewed the categories of archaeological objects submitted in the Request and recommended that the appended list of categories subject to pillage be

---

42 Patty Gerstenblith, Letter of October 11, 1999, Briefing Book, Tab I.

subject to import restrictions.  Recognizing the challenge of implementing these restrictions on the basis of stylistic attributes alone, the committee urges that the problem of enforcement receive serious review by U.S. Customs prior to the completion of an agreement.

> **Finding 3** - *Based on the information provided in the request from the Government of the Republic of Italy and supplemental information gathered during its investigation and review of the request, the committee finds first that the application of import restrictions with respect to Italian archaeological material if applied in concert with similar restrictions to be implemented in a reasonable period of time by those nations, whether or not state parties individually having significant import trade in such material, would be of substantial benefit in deterring a serious situation of pillage; and remedies less drastic than the application of restrictions are not available.*

Seven members voted for this finding; two voted against.

**Determination 4) that the application of import restrictions is consistent with the general interest of the international community in the interchange of cultural property among nations for scientific, cultural, and educational purposes.**

One committee member expressed the sentiments of the members voting for this finding in his observation that, "this is a truly unique opportunity to progress the agenda of the protection of cultural heritage in ways that are more contemporary and innovative at times when so much of the cultural patrimony is under threat from so many circumstances apart from looting, and new mechanisms have to be found not only to protect [cultural patrimony] but to finance the protection."  A number of recommendations were made in this regard: long term loans from Italian to U.S. museums; issuing more export permits for licit archaeological materials to drive the illicit market out; offers to sell duplicate archaeological materials; encouragement of excavation; and better protection for existing archaeological sites and museums.

> **Finding 4** - *Based on the information provided in the request from the Government of the Republic of Italy and supplemental information gathered during its investigation and review of the request, the committee finds that the application of import restrictions is consistent with the general interest of the international community in the interchange of Italian archaeological material among nations for scientific, cultural, and educational purposes.*

Six members voted for this finding; none against.  (Three members were not present for the vote.)

24

REPORT<br>ITALY REQUEST, 1999

## RECOMMENDATIONS FOR AN AGREEMENT

Members of the committee noted that the Italian request offers an extraordinary opportunity to make recommendations that would lead to a partnership to enrich Italian cultural patrimony and American cultural life. The following recommendations are compiled from committee comments, written testimony, letters, and public presentations at the open session and are intended to promote measures that are consistent with the intentions expressed in the preamble to the 1970 UNESCO Convention to educate and protect.[43] Several members of the committee expressed the view that the imposition of the import restriction requested by Italy should be conditioned by Italy's willingness to adopt all or most of the measures suggested below, both to increase protection and to increase accessibility.

*b ſ*

### *Measures to Increase Protection*

The committee applauded existing measures for protection, particularly the successes of the Carabinieri Nucleo per Tutela Patrimonio Artistico, but they also expressed concern about the depth of commitment of the Italian government to protecting its cultural patrimony. The committee and members of the public felt that much more could and should be done. Recommendations by committee members and the public are as follows:

*b ſ*

1. Provide documentation that Italy has increased protective measures in Apulia and Etruria, the two areas that seem to be particularly hard hit by looting in recent years.

*b ſ*

2. Institute a law that prohibits metal detecting on certain specific sites. A coin collector pointed out that metal detecting is legal in England except on sites of significant cultural value. He suggested that the same identification and restriction of use of metal detectors on specific sites would be worthwhile.
3. Develop regional agreements with other nearby market countries to restrict imports. Several dealers suggested in their letters and testimony that unless Italy's neighbors participate in the protection of cultural patrimony, U.S. restrictions would be ineffective.
4. Take steps to encourage more archaeological excavation, particularly in areas at greatest risk from looters. Provide tax incentives for funding excavation, for example.
5. Devote more funds to guarding existing archaeological sites and museums.
6. Institute stiffer penalties and prompt prosecution of looters to deter looting.
7. Provide more training for Carabinieri, particularly in investigating patterns of looting and smuggling routes out of Italy.

---

43 "CONSIDERING that the interchange of cultural property among nations for scientific, cultural and educational purposes increases the knowledge of the civilization of Man, enriches the cultural life of all peoples and inspires mutual respect and appreciation among nations,
CONSIDERING that cultural property constitutes one of the basic elements of civilization and national culture, and that its true value can be appreciated only in relation to the fullest possible information regarding its origin, history and traditional setting,
CONSIDERING that it is incumbent upon every State to protect the cultural property existing within its territory against the dangers of theft, clandestine excavation, and illicit export...."

25

### *Measures to Increase Accessibility*

Committee members and members of the public expressed the desire to see increased access to Italian cultural artifacts through extended loans, exhibitions, facilitation of legal export of antiquities, and state-approved sales of redundant artifacts in Italian museums. In some cases this would require revision of current laws and regulations and in other cases it would require better enforcement of existing laws. The following suggestions are consistent with determination four: "that the application of the import restrictions set forth in section 307 in the particular circumstances is consistent with the general interest of the international community in the interchange of cultural property among nations for scientific, cultural and educational purposes."

Excavation, Exhibits, Gifts, Exchange, and Sales

1. Change legislation regarding the temporary export of cultural patrimony to provide for extended loans (to 10 years) to foreign museums.
2. De-accession part of museum reserves and give, exchange, or sell them to other museums world-wide as study collections.
3. Publicize U.S. tax incentives for Americans to donate money to excavation,* publication, conservation, and other protective measures in Italy.
4. Create Italian tax incentives for archaeological excavation, publication, and conservation work. Particularly for prompt listing of finds with police forces.
5. Encourage the de-accession of the large number of similar or duplicate artifacts in museum reserves and allow the deaccessioned items to be sold on the open market.
6. Adopt a "Treasure Trove Law" similar to the one in England.
7. Implement tax incentives for listing or publishing finds.
8. Revise Italian export law to make it easier to export archaeological items legitimately sold within Italy and speed up the system for obtaining export certificates.

# APPENDIX A -- LIST OF OBJECT CATEGORIES RECOMMENDED FOR IMPORT RESTRICTION

Preface

The committee reviewed the full list encompassed within the Request and identified the following categories as those that merited priority  because their desirability on the art market promotes damage to archaeological sites and because they could be identified as coming from Italian archaeological contexts.

I. Stone
   A. Sculpture
      1. **Architectural Elements** - in marble, limestone, steatite, basalt, tufa and other types of stone.  Types include abacus, acroterion, antefixe, architrave, bacino, base, capital, caryatid, coffer, clipeus, column, crowning, fountain, frieze, pediment, drip molding, pilaster, mask, corbel, metope, mosaic and inlay, pluteus, pulvinar, puteal, jamb, tile, telamon, tympanum, trabeation, trasenna, basin, wellhead.  Date; $5^{rd}$ c. B.C. to 4th c. A.D.

      2. **Architectural and Non-architectural Relief Sculpture** - in marble and other stone.  Carved slabs with figural, vegetative, floral or decorative motifs, sometimes inscribed. Used for architectural decoration, funerary, votive, or commemorative monuments. Dates: 2nd c. B.C. to 4th  c. A.D.

      3. **Monuments** - in marble, limestone, and other types of stone.  Types include altar and shrine, cippus, funerary stele, and milestones with figural reliefs or decorative moldings.  Some have dedicatory inscriptions. Date: 7th c. B.C. to 4th c. A.D.

      4. **Sepulchers** - in marble, ceferino, limestone and tufa. Types of burial containers including urns, caskets, and sarcophagi.  Some have figural scenes carved in relief or decorative moldings. Date: 7th c. B.C. to 4th c. A.D.

      5. **Large Statuary** - primarily in marble. Types include human and animal figures and groups of figures in the round, from 1 m to 2.5 m in height. Large-scale free-standing statuary was placed in architectural, burial, and religious contexts. Life-size busts (head and shoulders of an individual) and portrait heads are common in the Roman Republican and later periods.  Date: 6th c. B.C. to 4th c. A.D.

II. Metal
   A. Sculpture
      1. **Large Statuary** - Large-scale statues in bronze or other metals include animal figures, human and divine figures, and life-size metal busts or portrait heads. Date: 5th c. B.C. to 4th  c. A.D.

2. **Small Statuary** - Iron Age Sardinian (Nuragic) and Etruscan figurines in bronze and other metals. Date: 7th to 3rd c. B.C.

B. **Vessels** - Open and closed vessels in bronze, gold, or silver, often with incised, embossed and molded decoration in the shape of human or animal figures. Shapes include bowls, buckets, craters, pitchers, cups and lamps, etc. Date: 8th c. B.C. to 4th c. A.D.

C. *Personal Ornaments* - Etruscan rings, necklaces, earrings, crowns, bracelets, buckles, belts, pins, chains of gold, silver, bronze, and iron Date: 8th c. to 3rd c. B.C.

D. **Weapons and Armor** - Body armor including helmets, cuirasses, shin guards, shields, and horse armor often decorated with elaborate engraved, embossed or perforated designs. Elaborate horse armor is also produced during the same period. Both launching weapons (spears and javelins) and weapons for hand to hand combat (swords, daggers, etc.) Date: 7th c. B.C. to 4th c. A.D.

E. **Inscribed or Decorated Sheet Metal** - Engraved inscriptions and designs on thin metal sheets are found in funerary contexts or sometimes as attachments to furniture. Date: 7th c. B.C. to 4th c. A.D.

III. Ceramic
   A. **Sculpture**
     1. **Architectural Elements** - Baked clay (terracotta) was used to decorate temples particularly in Sicily and Magna Graecia. In Etruria and Latium, the use of terracotta decorative elements was quite extensive. These included acroteri, antefixes, relief plaques, metopes, and revetments. Date: 7th c. to 1st c. B.C.

     2. **Monuments** - Altars and urns decorated with relief scenes. Date: 5th c. B.C. to 4th c. A.D.

     3. **Large Statuary** - Large-scale human and animal figure, life-size portrait heads, and life-size votive objects. These often adorned or were deposited in temples and sanctuaries in Magna Graecia, Etruria and Latium. Date: 7th to 3rd c. B.C.

     4. **Relief** - Plaques, tables, and other terracotta objects (masks) with relief decoration. Date: 6th to 4th c. B.C.

   B. **Vessels**
     1. **Local Vessels**
       a. **Etruscan** - decorated ceramic vessels produced by Etruscan culture including Orientalizing pottery with imitations of Near Eastern designs painted on local hand-made vessels; archaic Etruscan painted pottery with polychrome decoration; Italo-Geometric pottery where production from local Etruscan workshops imitated Greek Geometric; bucchero made with a

characteristic soft black paste and polished surface whose highly decorative shapes often imitate metal vessels; local imitations of black and red figure Attic; Etruscan imitations of Corinthian pottery; pottery with black glaze and orange stripes that imitates Ionic pottery; amphora in the Pontic style with painted figural decoration made by a single workshop of immigrant Ionic potters in Vulci, Etruria; Caeretan hydria attributed to a workshop of Greek immigrants working near Caere, Etruria. Date: 7th to 3rd c. B.C.

b. **South Italian** - decorated vessels locally produced including hand-made Daunian pottery from northern Apulia; Italiot red figure pottery of Attic derivation produced in Apulian, Lucania, Campania, and Paestum; wheel-made pottery with elaborate applied relief and painted decoration made in Centuripe, Catania; pottery with plastic and polychrome decoration produced in Sicily and Magna Graecia; gilded pottery with a characteristic ochre yellow color imitating artifacts in bronze, mainly found in tombs in Apulia; Faliscan pottery in imitation of Attic red figure; ften in oversize vessels; Gnathian pottery , named after Egnatia in Apulia and decorated in white and yellow with touches of red over a black background; overpainted pottery with a shiny black glaze pottery overpainted with white, yellow, or red designs in imitation of Attic red figure; Messapian pottery, locally produced in Apulia and decorated with monochrome (one color) or bichrome painting (two color). Date: 6th to 3rd c. B.C.

2. **Imported Vessels**

a. **Attic Black Figure, Red Figure and White Ground Pottery** - These are made in a specific set of shapes (amphorae, craters, hydriae, oinochoi, kylikes) decorated with black painted figures on a clear clay ground (Black Figures), decorative elements in reserve with background fired black (Red Figure), and multi-colored figures painted on a white ground (White Ground). Attic pottery was widely exported, particularly to southern Italy, where it is commonly found in burials. 6th to 3rd c. B.C.

b. **Corinthian Pottery** - Painted pottery made in Corinth in a specific range of shapes for perfume and unguents and for drinking or pouring liquids. The very characteristic painted and incised designs depict figural scenes, rows of animals, and floral decoration. Corinthian pottery was exported throughout the Mediterranean, but particularly to Etruria and southern Italy. Date: 8th to 6th c. B.C.

IV. Glass

A. **Architectural Elements** - Mosaics and glass windows. Date: 4th c. B.C. to 4th c. A.D.

B. Sculpture

    1. **Intarsia** - Cut or carved glass decorative elements to inset in furniture.
Date: 2nd c. B.C. to 4th c. A.D.

    2. **Small Statuary** - Glass animal statuettes as amulets or knickknacks.
Date: 2nd c. B.C. to 4th c. A.D.

# V. Painting

## A. Wall Painting

    1. **Domestic and Public Wall Painting** - Beginning in about 200 B.C. wall painting in private and public buildings Is characterized by imitation of stucco or marble design. Later developments include "architectural" style, "ornamental" style, and "fantastic " style. Triumphal painting in temples and public buildings illustrate military campaigns and conquered lands. Date: 3rd c. B.C. to 4th c. A.D.

    2. **Tomb Paintings** - Early tomb paintings are primarily found in Etruria and Southern Italy. These paintings were directly influenced by Greek painters, but illustrate local style. Scenes often illustrate funerary celebrations, rites, symbols, and daily events. Roman funerary painting is also inspired by Greek painting, but also develops from domestic and public types of wall painting. Date; 6th c. B.C. to 4th c. A.D.

# APPENDIX B -- LIST OF INDIVIDUALS SUBMITTING MATERIALS TO THE COMMITTEE

Brian Aitkin, Acanthus Gallery, New York, NY, dealer
Russell Alvarez, coin collector
Gustavo Araoz, US/ICOMOS, Washington, DC, NGO official
A.H. Baldwin, London, coin dealer
Kevin Barry, Barry & Darling Ancient Coins, coin dealer
James Barry, Hampstead, NC, coin dealer
Steven Bellin, coin collector
Michael Bennett, Cleveland Museum of Art, Cleveland, OH, curator
Harlan Berk, Harlan J. Berk, Ltd., Chicago, IL, coin dealer
Joseph Blazick, coin collector
Bruce Blumenthal, Langhorne, PA, coin collector
Mikel Brooks, Austin, TX, coin collector
Robert Calhoun, coin collector
Joseph Carter, University of Texas, Austin, TX, archaeologist
Joseph Clayton, coin collector
Steven Clayton, coin collector
Michael Cole, Ceres, CA, coin collector
Stephen Coulter, Des Moines, IA, coin collector
James Cuno, Harvard University Art Museums, Cambridge, MA, museum director
Robin Danziger, Educational Coin Co., Kingston, NY, coin dealer
Nancy De Grummond, Classics Department, Gainesville, FL, archaeologist
Torkom Demerjian, Ariadne Gallery, New York, NY, dealer
Charles Deur, Arlington, TX, coin collector
J.P. Divo, International Association of Professional Numismatists, Zurich, coin collector
Stephen Dyson, Classics Department, Buffalo, NY, archaeologist
Robert Ehrlich, Wilmington, DE, coin collector
Dick Eidswick, Ann Arbor, MI, coin collector
Jerome Eisenberg, Royal-Athena Galleries, New York, NY, dealer
John Electrum, Miamisburg, OH, coin collector
Ricardo Elia, Vice-President, Archaeological Institute of America, Boston, MA, archaeologist
Warren Esty, Montana State University, coin collector
Lawrence Gaye, Beaverton, OR, coin collector
Patty Gerstenblith, DePaul University, Chicago, IL, law professor and archaeologist
Michael Godier, St. Peters, MS, coin collector
Jim Gossett, Ithaca, NY, coin collector
David Grace, Covington & Burling, Washington, DC, attorney for Sotheby's and Christies
Pat Halligan, Langley, WA, coin collector
Paul Heuton, Atlanta, GA, coin collector
Ross Holloway, Brown University, Providence, RI, archaeologist
Eric Hostetter, University of Illinois, Urbana, IL, archaeologist
Arthur Houghton, Arthur Houghton Associates, Inc., Washington, DC, collector
David King, coin collector
James Kinney, coin collector
Arielle Kosloff, Merrin Gallery, New York, NY, dealer
Santina LaValla, Italian-American

F. A. Liberatore, N. Billerica, MA, coin collector
Christopher Lihou, Bethesda, MD, coin collector
Henry Clay Lindgren, San Francisco State University, San Francisco, CA, collector
Ed Love, coin collector
Claire Lyons, Getty Museum, Los Angeles, CA, curator
C.J. Martin, The British Numismatic Trade Assoc., Surrey, coin dealer
Eric McFadden, Classical Numismatic Group, Inc., London, coin dealer
Rena Moulopoulos, Sotheby's, New York, NY, auction house representative
Wilhelm Museler, Dr. Busso Peus Nachf. Munzhandlung, Frankfurt, coin dealer
Jennifer Neils, Case Western Reserve University, Cleveland, OH, art historian
Michael Padgett, Princeton University Art Museum, Princeton, NJ, curator
Lisa Pieraccini, St. Mary's College, Los Angeles, CA, archaeologist
John Pett, Spink and Sons, London, coin dealer
Gloria Pinney, Harvard University, Cambridge, MA, art historian
Richard Ponterio, Ponterio & Associates, San Diego, CA, coin dealer
Bob Reis, Raleigh, NC, coin collector
Dennis Rider, coin collector
Douglass Rohrman, Chicago, coin collector
William Rudman, Belmont, MA, coin collector
Jeremy Sabloff, University of Pennsylvania Museum, Philadelphia, PA, museum director
Thomas Schroer, Cincinnati, OH, coin collector
Frederick Schultz, National Association of Dealers in Ancient, Oriental and Primitive Art,
          New York, NY, dealer
J. Alex Sherlock, Saint Peter's Church, Montgomery, AL, coin collector
Fred Shore, Schwenksville, PA, coin dealer
Jesse Smith, coin collector
Harvey G. Stack, Stack's, New York, NY, coin dealer
Ciro Taddeo, Arlington, VA, coin collector
Peter Tompa, Carr Goodson Warner, Washington, DC, coin collector
Gar Travis, American Numismatic Association, Wilmington, NC, coin collector
Nancy Trimble, coin collector
Marion True, Getty Museum, Los Angeles, CA, curator
Tony Tuck, Indiana University, Evansville, IN, archaeologist
Italo Vecchi, Italo Vecchi, Ltd., London, coin dealer
Edward Waddell, Edward J. Waddell, Ltd., Gaithersburg, MD, coin dealer
Alan S. Walker, Leu Numismatics, Zurich, coin dealer
Gregory Warden, Southern Methodist University, Dallas, TX, archaeologist
John Waters, Carlsbad, NM, coin collector
Arnold-Peter Weiss, American Numismatic Society, Providence, RI, coin dealer
David Welsh, Anaheim, CA, coin collector
Shelby White, New York, NY, collector
Malcolm Wiener, Institute for Aegean Prehistory, New York, NY, collector
Nancy Wilkie, Archaeological Institute of America, Boston, MA, archaeologist
Glenn Woods, coin collector
Gregory Zentz, Jacksonville, FL, coin collector
Lee Zimerman, Philadelphia, PA, collector
Carl Zipfel, coin collector