# ANCIENT COIN COLLECTORS GUILD, et al.,

## v.

# UNITED STATES DEPARTMENT OF STATE

# Civil No. 07-2074 (RJL)

# Exhibit J



# ART & AUCTION

INSIDE THE ART MARKET

US $5.95 / CANADA $8.95 MARCH 2002

## Stealth Fighter

**Maria Kouroupas**, a mid-level State Department bureaucrat, has been Washington's smart weapon in its shadowy war on collecting antiquities. But now, her methods and motives are under attack.

**JAMES BURROWS'S OTHER *FRIENDS*: THE TV PRODUCER AS COLLECTOR**

**GOTHIC REVIVAL: SPIRIT AND STYLE**

Critics argue that an unknown D.C. bureaucrat, working behind closed doors, is thwarting the will of Congress in a one-sided campaign against the antiquities trade. How does Maria Kouroupas answer such charges? All too typically, she doesn't. **By Steven Vincent**

THE WOMAN SEATED ACROSS FROM ME DOES not look like a crusader. Short and middle-aged, her shoulder-length black hair streaked with gray, she doesn't exactly fit the charismatic image of a zealot out to eradicate the looting of archaeological and cultural sites across the globe. As a mid-level bureaucrat in an obscure office of the U.S. Department of State, she hardly appears capable of influencing events in places as far-flung as the jungles of Cambodia, the Bandiagara Escarpment in Mali or the tundra of western Canada. She looks, in fact, like somebody's grandmother.

But to many who purchase, collect and exhibit the art and artifacts of ancient civilizations, Maria Papageorge Kouroupas is the devil incarnate. They believe that from the State Department's Bureau of Educational and Public Affairs, where she is staff director of the Cultural Property Advisory Committee (CPAC), she has pursued a veritable—and intensifying—fatwa against the antiquities trade, accusing it of stimulating the plunder of the world's temples, monuments, burial grounds and other fragile, artifact-rich sites.

Her critics argue that Kouroupas, supported by archaeologists, journalist allies and government policy, threatens the livelihood of dealers and imperils the ability of museums and private citizens to enrich their collections. She has, they say, successfully hijacked American foreign policy on cultural patrimony, thwarted the will of Congress and violated the spirit, if not the letter, of U.S. law. Like some unholy cross between Carry Nation and Colonel Kurtz, Kouroupas must be reined in, her opponents believe, not only to protect future collections of cultural artifacts but also for the sake of democratic accountability.

I've come to Washington, D.C., on this fall afternoon to hear Kouroupas's side of the story—one that officials at Foggy Bottom evidently do not want the public to hear. According to rules set down by State Department spokesperson Catherine Stearns, I can speak to Kouroupas only on "deep background." In addition, I am prohibited from quoting the two lawyers who join Stearns and Kouroupas in our meeting. "That's how we've done things with other reporters," Stearns says.

Perhaps, but it is also emblematic of the way Kouroupas operates. Secretive, obsessed with controlling information and disdainful of the interests of dealers, she and the State Department committee she heads remain largely unaccountable to the press and general public. Under her stewardship, the committee, charged with determining which cultural objects the government should ban from entering the U.S., has been transformed "into an autonomous private club," says an aide to former senator Daniel Patrick Moynihan, the New York legislator who sponsored a proposal to reform the Cultural Property Advisory Committee in 1996. "Under Maria, it has become dominated by archaeologists who hate the trade and have no tolerance for other points of view."

Namely, the points of view advocated by dealers, collectors and many museum officials in support of a free trade in antiquities. To them, an open market has almost incalculable benefits, ranging from the preservation of objects in private and public collections, where they are safe from looters or even fanatical governments, to the promotion of cultural understanding between nations. Moreover, they argue, criticism of the trade is often used to cover up the failure of antiquities-rich countries, or so-called source nations, to take adequate measures to protect against looters—not to mention official black-marketeering and other forms of government corruption.

Kouroupas disputes accusations that she has overstepped her mandate and transformed the CPAC into a platform for hard-line archaeologists who vigorously oppose all commercial trade in antiquities—she's simply performing her duties as a government official, she says. But exactly how she carries out those duties is not entirely clear. Quiet and determined, she works in the shadows and is well-versed in the jujitsu of bureaucratic turf-protecting. "Maria exerts an enormous influence in this complex and little-understood area of State's activities," says a former colleague. "But you'd never know it. She's the ultimate bureaucrat. She never leaves fingerprints."

I T WASN'T SUPPOSED TO BE LIKE THIS, OF COURSE. Certainly U.S. officials didn't envision that a single functionary would wield such influence over its cultural policies when the country signed the Unesco Convention on the Means of Prohibiting the Illicit Import, Export and Transfer of Ownership of Cultural Property in 1972. This international agreement aimed at curtailing the looting of archaeological sites called for protective measures to control "exports and imports and international commerce" in cultural objects from source countries. In 1983, after a decade-long debate, the U.S. Congress adopted numerous provisions of the convention in the Cultural Properties Implementation Act (CPIA), co-sponsored by senators Spark Matsunaga of Hawaii and Robert Dole of Kansas. The CPIA legislation established a process that allows source nations to request U.S. bans on the importation of certain types of ethnographic or archaeological material from within their borders. By restricting these objects' entry into the American market, legislators believed, the U.S. would help reduce the incentive to plunder, unlawfully excavate or otherwise illegally remove the material from fragile cultural sites.

At the same time, however, Washington didn't want the new law to encourage foreign nations to request overly broad import restrictions and choke off legal trade. With this in mind, the

When a petition has met these standards, it is referred to the CPAC, currently administered by Maria Kouroupas. The committee is composed of unpaid members appointed by the White House. As stipulated by the CPIA legislation, its 11 members—3 from the archaeology community, 3 representing the art trade, 3 reflecting the so-called public interest and 2 associated with museums— are responsible for reviewing requests for import restrictions submitted by foreign nations and determining whether they should be accepted, rejected or amended. (In its 18-year existence, the CPAC has never rejected outright any petition to restrict imports.) The committee's findings are passed on to a "decision-maker," also in the State Department, who confers with officials in the White House and Treasury Department (import restrictions are enforced by U.S. Customs, which falls under the Treasury Department) and makes a final determination.

The decision-makers were originally members of the United States Information Agency (USIA), which oversaw the CPAC until 1999, when the agency was incorporated into the State Department. Patricia Harrison, the assistant secretary of state of educational and cultural affairs who currently holds the position, began her duties in October and has yet to rule on any petitions.

The first restrictions under this system were enacted in 1987, when the U.S. banned imports of pre-Columbian objects originating from the Cara Sucia region of El Salvador. Since

> "I don't believe I've ever seen a[n]
> Maria has reflected the balance[d]
> patrimony that the law demands."

CPIA's framers carefully tried to balance the interests of dealers, collectors and museums with those of source nations concerned about looting. "We felt we were in the business of encouraging the legitimate circulation of cultural objects," says New York modern and contemporary art dealer Meredith Palmer, who worked as a cultural officer at the State Department in the 1970s with pioneers in the cultural patrimony field, such as then Harvard law professor Paul Bator, now at the University of Chicago, and State Department lawyer Mark Feldman, to help develop the legal and intellectual framework for the CPIA legislation. "We took great pains to ensure that any law based on the Unesco Convention reflected the broad interests of the American people."

The CPIA created a system that contains a number of checks and balances. For example, a nation seeking U.S. import restrictions on cultural objects must draft a petition stating the reasons for its request. This petition, in turn, must meet certain criteria. It must document the depth of the nation's looting problem, and explain what internal steps it is taking to alleviate the situation. It also has to establish that the U.S. market for the looted objects is sizable enough to merit restrictions, and show that other countries are enacting similar import restrictions (if the U.S. is the only nation applying a ban, the trade will simply shift elsewhere). To prevent overly broad restrictions, the CPIA requires that the petition identify well-defined categories of endangered objects and refer to specific cultural sites jeopardized by looters. "We had no intention of giving foreign nations a blank check to demand blanket protections," Palmer remarks.

then, Washington has reached similar agreements with nine other nations—Canada, Nicaragua, Bolivia, Guatemala, Peru, Mali, Cambodia, Cyprus and Italy. In the beginning, even the most ardent free-trade advocates supported certain restrictions—such as those placed on objects from Sipan in northern Peru in 1990 and on material from Peten, Guatemala, in 1991. But these protections were not without consequence for the legal trade, as dealers came to realize. "Over time, these restrictions chilled the market for pre-Columbian artifacts in the U.S.," says respected modern art dealer André Emmerich, who in the 1970s and '80s also handled archaeological material from Central and South America. "By the 1990s, the trade in major objects had largely shifted to Europe, where they don't have these regulations—leading us to wonder what exactly the State Department had accomplished."

D EALERS SOON FOUND REASONS TO BE concerned about the CPAC's process of reviewing petitions, which they contend has become increasingly slanted toward the antitrade position of archaeologists. Since at least the late 1960s—when issues concerning cultural patrimony were first discussed publicly—archaeologists have criticized antiquities dealers and collectors, arguing that even when objects are legally removed from the context of their cultural sites, they lose their importance as historical information and hence

their value to research. Over time, however, many archaeologists—particularly those connected with the Archaeological Institute of America (AIA) in Boston—adopted the increasingly polemical view that the activities of the antiquities trade are irremediably, even morally, wrong.

By the 1990s, this position was virtually axiomatic among archaeologists on the CPAC, former committee members contend. "Somewhere along the line," says Jack Josephson, who was chairman from 1990 to 1995, "they began to see as their job not to give balanced reviews of petitions for import restrictions, but to eliminate illegal exportation worldwide."

This shift within the CPAC began before Maria Kouroupas became director in 1993, but according to sources familiar with the committee's activities, it intensified after she took over. "Maria is very proactive," Josephson says. "She agrees with the AIA's position that the art trade is a dirty thing and should be eliminated." Reinforcing her sentiments were CPAC counsels, including R. Wallace Stuart, who served from 1984 to 1987, and Richard Werksman, who served from 1987 to 1999. "Both lawyers had the opinion that the trade could not be trusted," says Josephson.

As the '90s progressed, the antitrade bias became wholly entrenched: "Many archaeologists and the CPAC administration openly discussed the trade as if by its very nature it was

nstance when
iew of cultural

replete with looters," says Gerald Stiebel, a New York dealer in Old Master paintings and French 18th-century decorative arts and a committee member from 1995 to 1999. "One archaeologist even said that there shouldn't be any museum collections of antiquities," Stiebel recalls. "I once asked the CPAC counsel if we could get more information from the protrade side and he said, 'From whom—the looters?'" Indeed, the committee had become so one-sided, according to Stiebel, that a stenographer recording deliberations over the 1997 Peruvian request said to him during a break, "Wouldn't it be easier just to vote without the discussions?"

Surely Maria Kouroupas knows better. As CPAC director, she presumably knows every point of view regarding cultural patrimony. Shouldn't she ensure that the arguments supporting free trade also receive a fair hearing in committee deliberations?

"It was tremendously dispiriting," says one antiquities dealer who served on the CPAC in the mid-1990s and was embittered by the experience. "Nothing, *nothing* dealers said made any difference. It was a rubber-stamp committee."

At the same time, based on the CPAC's recommendations, the U.S. began adopting agreements with a growing number of countries to restrict imports. As established by the CPIA legislation, these agreements—also known as Memoranda of Understanding (MoUs)—can take two forms, both intended to provide limited, accountable and temporary protection. "Emergency" restrictions apply to situations in which looting is especially dire and the objects or sites are of "high cultural

## CULTURAL PROPERTY ADVISORY COMMITTEE (CPAC)

*Members are appointed by the White House. Their tenure is typically three years, but can be longer. Below, a list of current members, the year they began serving and their professional affiliations.*

**Martin Sullivan, committee chair (1995)**
Director of the Historic St. Mary's City Museum, St. Mary's City, Maryland

**Miguel-Angel Corzo (1995)**
President and CEO of the University of the Arts, Philadelpnia

**Hester Davis (1995)**
Archaeologist at Arkansas Archaeological Survey, Fayetteville, Arkansas

**Prudence Rice (1995)**
Acting director of research, development and administration at Southern Illinois University, Carbondale, Illinois

**Richard Lanier (1996)**
Director of the Trust for Mutual Understanding, New York

**Susan McIntosh (1996)**
Professor of anthropology at Rice University, Houston

**Gary Vikan (1999)**
Director of the Walters Art Museum, Baltimore

**Patty Gerstenblith (2000)**
Professor in the College of Law at DePaul University, Chicago

**Kate Fitz Gibbon (2001)**
Owner of the Anahita Gallery, Santa Fe

significance" to the countries concerned. Because time is presumably of the essence in such cases, countries can obtain emergency restrictions without demonstrating that other governments are undertaking similar policies. These agreements last for five years, but can be extended for three-year periods. (Only one MoU—with Bolivia, signed in 1989—has expired without being renewed.)

Bilateral agreements cover a broader range of objects whose cultural significance is not necessarily "high." In addition,

unlike emergency restrictions, bilateral agreements can be implemented only if similar restrictions are imposed by other market nations. They last five years, and can be extended for five-year periods.

With Kouroupas at the helm of the CPAC, the State Department has accelerated the signing of MoUs. From 1987 to 1996, the U.S. implemented five emergency restrictions and one bilateral agreement. From 1997 to 2001, it enacted two emergency restrictions and seven bilateral agreements—three since 1999, including one with Bolivia signed on December 4. This past August, the CPAC began considering a request from Honduras for protection of pre-Columbian objects, and there have been reports that Greece and China may soon petition for MoUs. One former CPAC member recalls, "Maria was always telling us, 'The U.S. has to lead the way in combating looting so other countries will follow'—and to her, that always meant more import restrictions."

An even more worrisome development is that the restrictions themselves have become steadily broader and more encompassing, involving countries that presumably could protect their own cultural patrimony without U.S. help. In 1997, Washington signed a bilateral agreement with Canada, banning the importation of archaeological and ethnographic objects originating from Eskimos, Indians and aboriginal peoples. In 2000, another bilateral agreement was signed with Italy, restricting the importation of a vast swath of objects, from Etruscan pottery to Roman armor, dating from the 9th century B.C. to the 4th century A.D. From the trade's viewpoint, these agreements violated the spirit and letter of the CPIA legislation, which was intended to provide limited import restrictions only after countries have passed a fairly rigorous standard of proof.

"We never saw any compelling evidence that Canada had a looting problem," remarks noted Old Masters dealer Eugene Thaw, who joined the committee in 1995. He resigned in 1998, citing in a letter to New York senators Moynihan and Charles Schumer his belief that the committee had gotten "on the wrong track" and was "approaching the issue from only one point of view." Thaw also questions the comprehensive nature of the agreement with Italy. "It's absurd," he says. "Look at Etruscan sculptures—there are thousands of them in Italy. The country can't possibly show them all. They could supply collections for years by letting duplicates onto the market."

Adds Josephson, "When I look at the Canadian and Italian agreements, I can only conclude that the process has gone beyond any degree of fairness and that the CPIA has been subverted." Palmer agrees. "The current system is far from what Congress intended and what we worked so hard to produce," she says.

O NE REASON CRITICS GIVE FOR THE CPAC'S skewed review process is that committee membership is not fairly balanced. Although the original legislation stipulated that the committee have three dealers, two of these slots have remained vacant since 1998. Officially, State Department officials and Kouroupas say they deplore the absence of dealers. But it is their strict interpretation of federal conflict-of-interest regulations that is at least partly responsible for keeping dealers from participating. Intended to bar individuals from involve-

ment in policymaking in areas in which they have financial interests, these strictures have the additional effect of preventing or discouraging the involvement of dealers with expertise in antiquities.

In 1999, for example, State Department lawyers quashed Emmerich's proposed appointment to the committee, claiming that his position as a consultant for Sotheby's constituted a conflict of interest. When the White House appointed James Lally, a leading New York Asian art dealer, to the committee in 2000, the State Department's legal expert requested that he recuse himself from discussing or voting on matters pertaining to Asian objects. Lally refused, and his appointment did not go forward. "For the State Department to tell people who have spent their lives in an area of expertise that they have to be mute on that subject seemed to me not only illogical, but a perversion of the original intent of the committee," Lally says. "It was one more step in the State Department's goal of taking teeth out of any advocacy for the trade, collectors or museums."

"I was very disappointed in the Lally situation," says current CPAC chairman Martin Sullivan, director of the Historic St. Mary's City Museum in Maryland. "The State Department seems obsessed with conflict-of-interest matters. They are so rigid, it is difficult for anyone who has knowledge of antiquities or archaeology to become a member of the committee."

As a result, dealers who do serve on the CPAC often come

Kouroupas seems
position that
thing and should

from fields not associated with archaeological objects or ancient art. "When I was on the committee," remarks Stiebel, "I could articulate general principles about the art market, but as for the actual antiquities trade, that was not my area of expertise. In order to really understand the antiquities trade, one must have direct involvement and experience in that field."

But once appointed, dealers can still find themselves constrained by supposed conflict-of-interest issues. Take, for instance, the sole trade representative currently on the committee—Kate Fitz Gibbon, a Santa Fe dealer in central Asian antiques, art and photographs who began her tenure in 2001. "I was asked to recuse myself, not only from voting but from any discussion of any country whose material I dealt in or collected," Fitz Gibbon wrote to me in a fax. "Such recusal requests imply that dealers and collectors have acquired their material illegitimately, and presumes that they are motivated solely by financial interests. This is insulting."

And unfair. For although State Department lawyers scrutinize the activities of dealer nominees to the CPAC for possible conflicts of interest, they seem less rigorous when it comes to archaeologists. To date, no archaeologist has ever been denied a CPAC seat because of such concerns. "Archaeologists always maintained the position that they had

no conflicts of interest because they were paid by universities," says Stiebel. This reasoning is faulty, at best, protrade critics contend: Archaeologists, like all academics, have a vested interest in their own careers and reputations, and in the reputations of the educational institutions they serve. Moreover, it stands to reason that they would be eager to appease nations in which they or their colleagues carry out excavations or research. Failing to do so might affect permits, licenses and the social and educational ties necessary to archaeologists working in those countries. "Archaeologists have as much or more at stake when it comes to deciding on a nation's petition," says Lawrence Reger, president of the nonprofit Heritage Preservation in Washington, D.C., who served on the CPAC from 1996 to 2000.

**B**UT IF THE STATE DEPARTMENT SEEMS obsessed with conflicts of interest, it has another, equally troubling, fixation: secrecy. Although the CPIA legislation calls for "open meetings and transparent procedures," State Department lawyers routinely classify as confidential much of the information in import restriction petitions—such as the location of endangered cultural sites and the extent of a nation's looting problem—making it difficult for the trade, the media and the general public to judge whether restrictions are warranted.

problem for our relations with Canada," the report read.

While secrecy may protect diplomatic relationships, Stiebel remarks that it also "makes it impossible for committee members to obtain the broadest possible knowledge on a foreign nation's petition." As a result, CPAC members must rely on information supplied by the State Department or on comments made by experts and other concerned individuals during public hearings. But here the trade is also at a disadvantage. Because the State Department classifies so much of the information in a foreign nation's petition for import restriction, advocates for the trade have no effective way of challenging it.

"It's like shooting at targets in the dark," says one protrade lawyer. "No one knows what material a foreign nation is seeking protections for, or how serious their looting problem really is." On the contrary, despite State Department confidentiality requirements, speakers supporting restrictions often do know the contents of a petition, says Thaw, explaining that they are frequently archaeologists who work in the petitioning country and know officials there. Reger adds, "We had one instance when the consultant who spoke to us about a nation's petition admitted that he had actually assisted in the preparation of that petition."

What is particularly frustrating, say former CPAC members, is that confidentiality rules prevent them from seeing the final version of reports sent by the committee to the

o have embraced the archaelogists'
he art trade is an inherently dirty
e eliminated.

As former CPAC members relate, documents are regularly stamped "Eyes Only," even information found on the Internet.

"We were not allowed to keep any of the material given to us for deliberation, nor discuss with anyone outside the committee the substance of a nation's petition," Stiebel says. "Once I asked the CPAC's counsel if I could share my dissenting opinion with others and he said, 'Sure, but it might very well be the last thing you do for this committee. Do you understand?'" This veil of secrecy even hangs over remarks made by non-CPAC members during the public portion of committee deliberations. One auction house official who spoke before the CPAC was told she had to file a Freedom of Information Act request in order to obtain a transcript of her own remarks.

The government justifies the secrecy in part by pointing to the CPIA law. The section that established the CPAC also allowed for the suppression of "small volumes of information" that, if made public, "could adversely affect the President's ability to negotiate" import restrictions—such as something that might embarrass or compromise a source nation. In 1990 the Justice Department issued a report stating that officials had the right to classify nearly all documents relating to a Canadian request for import restrictions. "Breaching confidentiality in this matter would pose a

decision-maker. But at least one report has fallen into public hands. In the mid-1990s, a prominent New York collector of African artifacts sought the decision-maker's report on the 1993 emergency restrictions regarding archaeological material from the Niger River Valley and the Bandiagara Escarpment in Mali. The USIA—then the CPAC's governing agency at the time—made him file a Freedom of Information request, then sent him a redacted 35-page document. "All but five pages were blank," the collector says. Unsatisfied, he obtained a copy of the full report from the American embassy in Mali through a third party. "It had no input from dealers or the trade—it only contained the archaeologists' point of view," he says. "It was totally slanted against the trade."

In 1999 Senator Moynihan decided that enough was enough. Together with William Roth, the Republican senator from Delaware, he submitted a bill that sought to overhaul and amend the process of reviewing requests for import restrictions on cultural objects. "My understanding is that the standards and procedures Congress meant to introduce in the CPIA are not being followed," Moynihan told the Senate. Among other measures, the bill would have eased the conflict-of-interest stipulations that limit dealer participation on the CPAC and would have opened up the fact-finding phase to

facilitate discussion and rebuttal of evidence supporting foreign nations' petitions. But Roth, facing a reelection campaign in 2000, withdrew his support of the legislation, reportedly because of pressure from constituents with deep ties to source nations, who claimed that the proposed changes would jeopardize the cultural patrimony of those countries. The bill languished in Congress and eventually died.

I T IS IN THIS SYSTEM RIDDLED WITH SECRECY, ideological bias and bureaucratic derriere-protecting that Maria Kouroupas has thrived for 17 years. "Maria is dogged, persistent, absolutely determined to get done what she's dedicated to do," says Reger. Born in Little Rock, Arkansas, Kouroupas attended the University of Arkansas and the State College of Arkansas, earning a master's degree in history and education. In 1977 she went to the American Association of Museums in Washington, D.C., eventually moving to the United States Information Agency in 1984, where she became deputy director of the CPAC and, in 1993, its director. It was soon afterward, Kouroupas's critics say, to borrow a phrase used to describe Marlon Brando's out-of-control colonel in the film *Apocalypse Now*, that her methods became "unsound."

"Even before she came to the committee, Maria had been sympathetic to the archaeologists' cause," says Reger, who

Another former committee member remarks, "We were all hostage to the information she provided us."

According to several sources, Kouroupas's role as an information gatekeeper proved crucial in defeating Moynihan's 1999 reform bill. "We dealt with Maria closely and found it was very difficult to get information from her," recalls one former member of the senator's office. "On a whole range of topics—like how the CPAC operated, when and to whom they sent recommendations, how the State Department viewed the committee's reports, what other countries were doing to stop looting—we got little cooperation."

The original CPIA legislation states that Congress is supposed to receive copies of all committee recommendations, but Moynihan's office could find no record of them. "In the end, we realized Maria was stonewalling, waiting for the congressional session to end," the senator's aide says. "Since that was Moynihan's last session before his retirement, the delay killed the bill." Denying information to Moynihan's office may not have been Kouroupas's only effort to defeat the reform bill. "At the time, we believed that Maria and members of the CPAC staff were instrumental in drumming up opposition," says the aide.

But it was perhaps in the controversy surrounding the noted New York collector and philanthropist Shelby White that Kouroupas most displayed the power of a well-entrenched bureaucrat. Together with her husband, Leon

## The attacks on collector Shel[l] reached all the way into the Whit[e] Clintons themselves.

worked with her at the American Association of Museums from 1978 to 1984. Others say that once she was on the CPAC she became totally biased. "I don't believe I've ever seen an instance when Maria has reflected the balanced view of cultural patrimony issues that the law demands," says James Fitzpatrick, a Washington, D.C.-based lawyer who represents the National Association of Dealers in Ancient, Oriental and Primitive Art. "She once told me, after I complained that the committee was going beyond the legislation, 'You people in the trade are going to have to get used to a world where everything is affected by U.S. import restrictions.'"

Certainly Kouroupas's influence is extensive, if not obvious to outsiders. Because of the State Department's secrecy policies, she is the committee's main source of information. "She would receive a foreign government's petition, then present it to the committee, in addition to any documents pertaining to that request," Josephson says. "I felt she walked a fine line between giving us that information fairly or not." Case in-point: a committee discussion on the issue of whether the U.S. was acting alone or in concert with other nations in approving import restrictions. Says Stiebel, "We would ask, 'What steps is Britain taking, or France?' and she would dismiss our questions by saying, 'They've signed the Unesco Convention,' as if that in itself satisfied the CPIA."

Levy, White has been an outspoken defender of the antiquities trade. In April 2000, President Clinton appointed her to the CPAC as one of three representatives of the general public. "I waited several months for more information, but nothing came," says White. "Finally I called Maria, who reluctantly agreed to see me in Washington." Once there, White was informed that she had failed to fill out certain forms—which she claims she had never received. Even after obtaining the necessary paperwork, "Maria was absolutely no help to me," White says. "The forms were extensive and they included FBI background checks, but she never offered to guide me through the process." The nomination languished in bureaucratic limbo until Clinton left office, and President George W. Bush has not reappointed her.

Moreover, some of Kouroupas's harshest—and perhaps more conspiratorially minded—critics believe that she collaborated with archaeologists from the AIA and *Boston Globe* reporter Walter Robinson, who is known for his critical attitude toward the trade, in a propaganda campaign against White. In June 2000, two months after White's nomination, Robinson ran a devastating article about White and Levy in the *Globe*, accusing them of, among other things, collecting numerous unprovenanced—and therefore, the article insinuated, looted—antiquities. White, for one, suspects

Kouroupas may have tipped Robinson off about the nomination: "How could he have known if not for Maria?" Robinson denies this, stating only that his source "was someone in the archaeology community."

In any case, there's no question that the article cast a pall over White's nomination. "It was astonishing, the severity of the attacks on White," remarks former Moynihan chief of staff Tony Bullock. "It reached all the way into the White House, to the Clintons themselves. Now hardly anyone wants to sit on that committee." He continues, "It was evil, blocking the will of the President and the people of the United States. But Maria didn't do it alone—she worked with the complete knowledge and cooperation of the State Department."

D URING OUR MEETING IN WASHINGTON, Kouroupas seems genuinely surprised at the accusations leveled at her. And although I've been warned about her ability to dissemble with a bureaucrat's inscrutability, I have to wonder: Is this woman that powerful? Has she really commandeered American policy regarding cultural objects and turned it into an instrument to further the agendas of hardline archaeologists? Many dealers are convinced that the answer is yes. But for others, the answer is more complex.

"The truth is, no one in the State Department looks at the

White
House, to the

CPAC with the same degree of seriousness as they did in the early 1980s," says Palmer. In her view, a bureaucratic vacuum now exists that allows Kouroupas her authority. "In the old days, guys like Paul Bator or Mark Feldman could have alerted State that the committee had drifted from its original purpose. But Bator is dead and Feldman has moved on—and no one is watching the ship."

Some contend that the greatest problem afflicting the CPAC is not Kouroupas but the State Department itself, which tends to see bilateral agreements and emergency restrictions as diplomatic chits. Even when the committee fell under the authority of the USIA, Fitzpatrick says, "the State Department exerted great pressure on the process. They'd tell foreign nations, 'You support our diplomatic initiatives in your country and region, and we'll protect your cultural heritage in return."

Many in the trade believe, for instance, that the State Department pressured the USIA to approve the 1997 MoU with Canada in part to defuse Canadian anger over the Helms-Burton Act, which penalizes companies that do business with Cuba. And it is true that American ambassadors and cultural attachés regularly solicit requests from foreign nations for import restrictions as part of a "good neighbor" policy. Or, as one State Department lawyer told me, "We are

in the business of making other countries happy. The department is always looking for 'deliverables' we can give to other nations."

Reger sums up the problem nicely: "If the process of determining import restrictions were the responsibility of the Commerce Department—where issues of markets and free trade are paramount—and not the State Department, the administration of the CPAC might well be more favorable to the trade."

The State Department's inclination to see cultural artifacts as deal sweeteners rather than as objects to be admired and collected results in an almost total ignorance and disregard of the antiquities trade. The interests of dealers, collectors and museums simply take a backseat to worthier foreign policy goals.

One example of this institutional prejudice can be seen in the International Cultural Property Protection section of the State Department's Web site. Designed to educate the public about the issue of cultural patrimony and the CPAC, this section—overseen by Kouroupas—stresses bilateral agreements and emergency restrictions as a way to stem the tide of worldwide looting. To the State Department attorney I spoke with, this emphasis on MoUs is not only self-evident, it's the law. "We have a responsibility to see that the CPIA is being carried out," she avers. "Are we biased? Yes, biased toward protecting cultural sites from pillage and plunder."

But when I suggest that a free and legitimate trade in antiquities and archaeological objects can also protect a nation's patrimony—an open trade in Afghan objects, for example, might have saved much of that nation's cultural treasures from destruction by the Taliban—the lawyer falls silent. It is clear that she has never considered such an argument. The State Department understanding of this issue is that uninformed and blinkered. (State Department officials assured me that they would adjust the CPAC Web site to include this argument, but four months after our meeting, no change had been made.)

"Maria Kouroupas is not the entire problem," says one former CPAC member. "Her bureaucratic fiefdom has to reflect the wishes of her State Department superiors. And those wishes are clear: Cultural objects exist to make international friends and create better diplomatic relationships." But this ultimate bureaucratic defense—I'm just following orders—only partially explains Kouroupas's disdain for the antiquities trade. She also seems to exhibit a kind of institutional tunnel vision, reinforced by State Department policy goals and justified by her own belief that she is doing good in the world.

As she leads me out of the State Department building, I'm struck by how easy it would be for a mid-level bureaucrat managing an obscure but nonetheless influential government office to succumb to the temptation of becoming a defender of worldwide cultural and archaeological sites. It's a noble task, after all—the means are in her hands and the end is sanctioned by her superiors.

Walking me to a cab, Maria Kouroupas shakes my hand. "It was a pleasure meeting you," she says, in a perfect bureaucrat's voice. Presumably, that remark at least can go on the record.

STEVEN VINCENT is a contributing editor of Art & Auction.